STELLA BEHNEN BUETTNER, Appellant, *v.*
JOHN ALVIN BUETTNER, Respondent.

No. 6801

February 2, 1973                    505 P.2d 600

[Rehearing denied April 13, 1973]

*Harry E. Claiborne, Dean Breeze,* and *Paul V. Carelli, III,* of Las Vegas, for Appellant.

*Cromer and Barker,* of Las Vegas, for Respondent.

## OPINION

By the Court, ZENOFF, J.:

The parties to this action, in contemplation of marriage, entered into an antenuptial agreement which provided, in pertinent part, as follows:

"3. Both parties to this agreement, by execution hereof, do hereby agree and understand that they do completely and forever in the future relinquish all rights and claims, both legal and equitable, in the separate property estate of the other, except as otherwise set forth in this agreement.

"4. That in consideration of said marriage and of the covenants of this agreement, JOHN A. BUETTNER and STELLA BEHNEN hereby promise and agree to give, devise and bequeath by their last wills and testaments to each other, one half of all property of whatever kind and wherever situated owned by each other at the time of their death, together with a contingent interest in the remaining one half of all such property as set forth in said wills which are to be executed after the marriage of the parties.

. . .

"5. In the event that either of the parties to this agreement obtain a decree of divorce in the future thereby terminating the contract of marriage of the parties, STELLA BEHNEN, in addition to one half

share of the community property of the parties, shall receive from JOHN A. BUETTNER in release and discharge of all rights, claims interests in law and equity which she might have or could have in/or to his estate or property, real or personal, or any part thereof, the following described property to have and to hold as her separate property to-wit:

    (A) House and lot located at 1130 Ralston, Las Vegas, Nevada, together with all household goods and furniture located therein subject to the existing 1st Trust Deed.

    (B) The sum of Five Hundred Dollars ($500.00) per month each and every month for a period of five years for a total amount of Thirty Thousand Dollars ($30,000.00).

"Said money shall be paid to STELLA BEHNEN regardless of whether she remarries or not and shall commence on the first day of the month succeeding the issuance of the decree of divorce by a court of competent jurisdiction and continue thereafter on the first day of each succeeding month until paid in full."

The antenuptial agreement was silent as to the separate property, if any, of Stella Behnen, but listed the separate property of John A. Buettner, which was later estimated by him to be worth approximately $400,000.00.

Subsequent to the execution of the contract, but on the same day (December 6, 1970), the parties were married. Both parties had been married previously and had children by prior marriages. On April 9, 1971 Mr. Buettner instituted divorce proceedings against his wife alleging fraud and misrepresentation in the inducement to sign the prenuptial agreement, mental cruelty and incompatibility. The wife in her answer advanced the antenuptial agreement and urged the court, in the event it should award plaintiff a divorce, to enter its decree as to property settlement and support in conformance with the agreement of the parties.

The judge, after trial to the court sitting without a jury, did not make any finding of fact as to plaintiff's allegation of fraud and misrepresentation by the wife to induce him to enter into the agreement. Nor did he make any finding as to the alleged mental cruelty of the wife. Instead, the divorce was granted upon the ground of incompatibility.

As to the antenuptial contract, the court entered its finding of fact as follows:

"That said Pre-Marital Agreement, dated December 6, 1970, as entered into by and between the parties, is unfair and unjust to said parties."

As a conclusion of law, the court stated:

"That the Pre-Marital Agreement . . . was made in derogation of marriage, is contrary to public policy and is therefore void. . . ."

The court refused to honor the antenuptial agreement of the parties, whereunder the wife would get the house, all household goods and furniture and $500.00 per month for 5 years, and instead awarded the wife a dining room set, a couch and $2,000—payable at $166.67 per month for one year.

Mrs. Buettner has appealed from this decree claiming the trial court erred in refusing to give effect to the antenuptial agreement of the parties.

We are presented with two questions: (1) whether in this jurisdiction antenuptial contracts relating to property settlement and support in the event of divorce are void as contrary to public policy; and (2) if not, is this particular antenuptial contract so unconscionable or unfair that it should not be enforced.

1. While the court has never directly addressed itself to the question, a number of jurisdictions have announced the rule that contracts intended to promote or facilitate the procurement of a divorce are void and unenforceable as contrary to public policy. See, e.g., Posner v. Posner, 233 S.2d 381, 382 (Fla. 1970); In re Cooper's Estate, 403 P.2d 984, 998 (Kan. 1965).

The difficulty with the application of the rule is in determining when such a contract invites, promotes or encourages divorce. Agreements have been declared void which obligate one spouse to not defend or contest a divorce by the other spouse. Allen v. Allen, 150 So. 237, 238 (Fla. 1933); Gardine v. Cottey, 230 S.W.2d 731 (Mo. 1950); Perry v. Perry, 192 S.W.2d 830 (Tenn. 1946). Likewise, contracts under which there is an agreement to procure a divorce are invalid, McLean v. McLean, 74 S.E.2d 320 (N.C. 1953), as are those obligating the parties to conceal the true cause of the divorce by alleging another. Allen v. Allen, *supra.*

In addition, and by far the majority of the cases wherein such contracts are declared void, are those whereunder the husband sought to relieve himself of his duty to support the wife in the event of divorce, or to limit his liability for such support

to a small fraction of that which a court would be likely to decree in light of the wife's needs and the husband's ability to pay. See, e.g., Motley v. Motley, 120 S.E.2d 422 (N.C. 1961), and cases collected in 57 A.L.R.2d 942 et seq. The reason such contracts tend to promote or encourage divorce is set forth in Crouch v. Crouch, 385 S.W.2d 288, 293 (Tenn. 1964):

> "Such contract could induce a mercenary husband to inflict on his wife any wrong he might desire with the knowledge his pecuniary liability would be limited. In other words, a husband could through abuse and ill-treatment of the wife force her to bring an action for divorce and thereby buy a divorce for a sum far less than he would otherwise have to pay."

While in the normal case the wife urges the invalidity of the contract, here, the husband, using a strange twist on the above rationale, argues that the contractual provision relating to the property settlement and support was so generous in favor of the wife that she was induced by the hope of financial gain to so abuse and mistreat her husband as to force him to bring an action for divorce.

We are unconvinced. We do not find, nor did the trial court find, that the prospective wife entered into the contract with the intent to obtain a divorce from Mr. Buettner and thereby profit financially. There was no finding that the wife caused the divorce. In fact, it is uncontradicted in the record that the serious acts of divorce were committed not by the wife, but by the husband, who, on at least two occasions, beat the wife severely because of her refusal to change her name to conform to that of his previous wife in order to commit a tax fraud. As a result of such beatings, appellant was hospitalized and required to undergo surgery. Similarly, we do not believe the agreement to be so generous in favor of the wife that she would be induced to seek a divorce as a source of financial gain. In fact, it seems clear, particularly in light of Section 4 of the agreement requiring reciprocal wills, that it would have been in the best financial interest of the wife to remain married, thereby sharing in her husband's moderate wealth during their joint lives, and standing to receive a large share of his estate at his death.

This case, then, does not stand on the same footing as those wherein certain types of antenuptial contracts are said to be violative of public policy because they induce, encourage or promote divorce.

Antenuptial contracts whereby the parties agree upon the property rights which each shall have in the estate of the other upon his or her death have long been held to be conducive to marital tranquillity and thus in harmony with public policy. See, e.g., Del Vecchio v. Del Vecchio, 143 S.2d 17 (Fla. 1962); Stewart v. Stewart, 23 S.E.2d 306 (N.C. 1942). We perceive no reason why a different rationale should apply where the parties have attempted to set contractually the property rights of each spouse and the amount of support due the wife in the event a prospective marriage fails.

Other jurisdictions do uphold antenuptial contracts relating to property settlement and support in case of divorce. See, e.g., Hudson v. Hudson, 350 P.2d 596 (Okla. 1960); In re Borton's Estate, 393 P.2d 808 (Wyo. 1964).

We quote with approval language of the Supreme Court of Florida in Posner v. Posner, 233 S.2d 381, 384 (Fla. 1970):

> "There can be no doubt that the institution of marriage is the foundation of the familial and social structure of our Nation and, as such, continues to be of vital interest to the State; but we cannot blind ourselves to the fact that the concept of the 'sanctity' of a marriage—as being practically indissoluble, once entered into—held by our ancestors only a few generations ago, has been greatly eroded in the last several decades. This court can take judicial notice of the fact that the ratio of marriages to divorces has reached a disturbing rate in many states. . . .
>
> "With divorce such a commonplace fact of life, it is fair to assume that many prospective marriage partners whose property and familial situation is such as to generate a valid antenuptial agreement settling their property rights upon the death of either, might want to consider and discuss also—and agree upon, if possible—the disposition of their property and the alimony rights of the wife in the event their marriage, despite their best efforts, should fail. . . .
>
> "We know of no community or society in which the public policy that condemned a husband and wife to a lifetime of misery as an alternative to the opprobrium of divorce still exists. And a tendency to recognize this change in public policy and to give effect to the antenuptial agreements of the parties relating to divorce is clearly discernible. Thus, in Hudson v.

Hudson, Okl. 1960, 350 P.2d 596, the court simply applied to an antenuptial contract respecting alimony the rule applicable to antenuptial contracts settling property rights upon the death of a spouse and thus tacitly, if not expressly, discarded the contrary-to-public-policy rule."

The rule applicable to antenuptial contracts settling property rights upon the death of a spouse is set out by the Supreme Court of Kansas as follows:

"The general rule in this state is that contracts, made either before or after marriage, the purpose of which is to fix property rights between a husband and wife are to be liberally interpreted to carry out the intentions of the makers, and to uphold such contracts where they are fairly and understandably made, are just and equitable in their provisions and are not obtained by fraud or overreaching." In re Cantrell's Estate, 119 P.2d 483, 486 (Kan. 1942).

We have given careful consideration to whether antenuptial contracts settling alimony and property rights upon divorce are to be viewed in this state as void because contrary to public policy, and hold that they are not. Nevertheless, as with all contracts, courts of this state shall retain power to refuse to enforce a particular antenuptial contract if it is found that it is unconscionable, obtained through fraud, misrepresentation, material nondisclosure or duress.

2. Having determined that antenuptial contracts settling property rights and alimony in the event of divorce are not per se void, we direct our attention to the question whether the particular contract in this case is unconscionable, unreasonable in amount or improperly obtained.

Respondent attaches much significance to the fact that the trial court made the following finding of fact:

"That said Pre-Marital Agreement . . . is unfair and unjust to said parties."

The finding, however, is merely conclusory. It indicates none of the indicia of unfairness or ultimate facts leading to the conclusion that the agreement was unfair and unjust. We therefore do not feel bound by the trial court's finding of fact that the contract was "unfair and unjust." The record does not reveal

fraud, misrepresentation, material nondisclosure, duress or any other ultimate fact indicating unfairness or unconscionability of the contract.

The husband's own testimony from the record clearly shows the circumstances surrounding the execution of the contract:

"Q:   And during the course of the discussion of marriage she wanted a pre-nuptial agreement; is that what you are telling us?

"A:   It was mutually agreed.

"Q:   What did he explain to you was the purpose of a antenuptial agreement?

"A:   Protect both of our properties.

"Q:   And that was your main desire, was it not?

"A:   It was her, Stella and my desire.

. . .

"Q:   . But you didn't want to run a chance of just entering into a relationship where in the event that of your death that she might inherit your property or in the event of a divorce that you might have to divide half of your property with her, did you?

"A:   No.

"Q:   So, we can say, then, that you loved her with reservations.

"A:   Well, to a certain extent.

"Q:   But you wanted to retain your property rights and interest in your separate estate for the benefit of your children in case something happened, right?

"A:   Right.

"Q:   Because you had worked hard for your property, right?

"A:   Right.

"Q:   And it meant something to you, didn't it?

"A:   Yes.

"Q:   So, you didn't enter into this agreement down there recklessly, did you?

"A:   No.

"Q:   And you knew what it was all about and what you were about to do, your main purpose in going to Carelli's office was to be sure that your separate property was secure in the event anything occurred in the future as a way of divorce or separation; right?

"A:   Right.

. . .

"Q: The amount that was arrived at was arrived at by you and Mrs. Buettner there in discussing it with Mr. Carelli, right?

"A: Right.

"Q: You are not claiming, of course, that your name was forged to this agreement.

"A: No.

"Q: You freely and voluntarily signed it there in Mr. Carelli's office?

"A: Yes.

"Q: You are not claiming that Mr. Carelli or anybody else by duress induced you to sign this agreement?

"A: No.

. . .

"Q: . . . She never induced you to sign it?

"A: It was just a mutual agreement."

In summary, we hold that the antenuptial contract should be enforced. It is not void as against public policy, and it was fair and reasonable in its provisions, understandably and intelligently entered into, and not obtained by fraud, misrepresentation or nondisclosure on the part of the wife.

Accordingly, we reverse and remand this matter to the trial court for proceedings consistent with this opinion.

THOMPSON, C. J., and MOWBRAY, GUNDERSON, and BATJER, JJ., concur.