### 38539. SCHERER v. SCHERER.

MARSHALL, Justice.
The parties to this divorce proceeding, Robert Pauli Scherer, Jr., and Linda Hellstrom Scherer, were residents of the State of Michigan when they married in 1976. Immediately prior to their marriage, they executed an antenuptial agreement. The agreement states that it is to be construed and enforced in accordance with the laws of the State of Michigan. However, the parties subsequently became Georgia residents, and Robert filed the present complaint for divorce against Linda in the Fulton Superior Court. Both parties filed motions for partial summary judgment on issues concerning the enforceability and construction of the antenuptial agreement. The trial judge granted Robert's motion, and we granted Linda's application to appeal. The facts are:

When Robert and Linda married in 1976, it was the second marriage for both of them. Linda had one minor child by her former

marriage, and Robert had four minor children by his former marriage.

By gift and inheritance, Robert owned and controlled 21.4% of the stock in R. P. Scherer Corporation, with a market valuation of approximately $20,000,000. This corporation was founded by Robert's father in Detroit, Michigan, in 1933. Although it was originally a closely-held family corporation, it later became a public corporation with its stock traded on the over-the-counter market. Robert was the chief executive officer and chairman of the board of this corporation.

Robert desired to keep the stock in this corporation in the Scherer family, and to effectuate this he and Linda executed an antenuptial agreement on the evening before their marriage. Under this agreement, Robert's stock in the R. P. Scherer Corporation is referred to as the "Scherer stock," which is defined to include "any proceeds or other property received from any sale or exchange of such stock or any part thereof, and any proceeds from sale or exchange of such other property, and the principal of any investments from any such proceeds." Insofar as is material to the issues raised here, the provisions of the agreement provide as follows:

"2. Robert . . . agrees, in order to provide for Linda's continued support and maintenance in the event of termination of their marriage by the death of Robert, that Linda shall be named as the beneficiary of all insurance policies currently outstanding on Robert's life . . . providing for aggregate death benefits of $531,264. Robert agrees that such policies shall be continued in full force and effect and such designation of Linda as beneficiary shall be irrevocable during their marriage, provided that Robert shall have the right to substitute in place of such insurance other provisions by Will or inter-vivos trust of not less than a like sum for Linda's support and maintenance in the event of the termination of their marriage by the death of Robert.

"3. Linda hereby releases any and all rights and/or interests, statutory or otherwise, which may result from the marriage of the parties with respect to the Scherer Stock and agrees that the Scherer Stock shall remain Robert's sole and separate property, reserving any and all rights and/or interests, statutory or otherwise, which may result from the marriage of the parties with respect to Robert's assets other than the Scherer Stock. Robert hereby releases any and all rights /or interest, statutory or otherwise, which may result from the marriage of the parties with respect to all assets owned by Linda and agrees that such assets shall remain Linda's sole and separate property."

"5. In the event of the termination of marriage other than by

death, the intent and provisions hereof shall be considered and applied to the extent permitted by law.

"6. Linda and Robert acknowledge that each of them were [sic] represented by legal counsel of their own choice in the preparation of this Agreement; that each of them has read this Agreement and has had its contents explained to them by their respective counsel; and that they fully understand the terms, provisions and legal consequences of this Agreement."

"8. Linda and Robert agree that this Agreement shall be construed and enforced in accordance with the laws of the State of Michigan, even if subsequent to their contemplated marriage they establish residence in some other State, including a community property state."

In 1979, a disagreement developed between Robert and other members of the Board of Directors of the R. P. Scherer Corporation concerning the management of the company. As a result, in December of 1979 certain segments of the business conducted by the R. P. Scherer Corporation were incorporated under the name Storz Instrument Company. Robert transferred all of his stock in the R. P. Scherer Corporation to that corporation, and all of the stock in Storz Instrument Company was transferred to Robert. The main offices of the Storz Instrument Company were located in Atlanta, and Robert and Linda moved to Atlanta.

In December of 1980, Robert filed a complaint for divorce against Linda, stating that there were no minor children born of the marriage and requesting a divorce on grounds that the marriage was irretrievably broken. Linda filed an answer, admitting that the marriage was irretrievably broken and requesting, among other things, an equitable division of property as well as support for herself and her minor child. A divorce on the pleadings was granted, with the remaining issues reserved for later disposition.

Linda filed a motion for partial summary judgment, seeking enforcement of the antenuptial agreement by requesting Robert to pay her the sum of $531,264 plus interest. Robert filed a cross-motion for partial summary judgment, seeking a declaration that the antenuptial agreement is unenforceable in this state, or, in the alternative, an interpretation of the agreement under which Linda would be entitled to no payment from Robert as a result of their divorce.

The trial court entered an order denying Linda's motion for partial summary judgment, and granting Robert's cross-motion to the extent of ruling that the antenuptial agreement is enforceable and that Linda released any rights and/or interests which may have resulted from the marriage of the parties with respect to the Scherer

Stock as defined by the agreement.

1. Although the agreement itself states that it is to be construed according to the laws of the State of Michigan, in this proceeding both of the parties seek to have the enforceability of the agreement determined under the laws of the State of Georgia. In addition, as pointed out in Division 2, infra, the enforceability of antenuptial agreements is, of course, a matter of public policy. And it would appear that where the enforcement of a contract in this state draws public-policy considerations into question, those public-policy considerations will be determined according to the laws of this state. See *Nasco, Inc. v. Gimbert,* 239 Ga. 675 (2) (238 SE2d 368) (1977) and cits. Code Ann. § 102-108. For these reasons, we determine the enforceability of this agreement under Georgia law.

2. "In the past, there has been virtually unanimous agreement in all jurisdictions that prenuptial agreements purporting to settle alimony in the event of a future divorce are void ab initio as against public policy since they were considered to be in contemplation of divorce. Georgia has followed the majority position." Davies, Validity of Prenuptial Contracts Which Fix Alimony, 14 Ga. State Bar Journal 18 (1977) (referred to hereinafter as Prenuptial Contracts). See also Note, The Impact of the Revolution in Georgia's Divorce Law on Antenuptial Agreements, 11 Ga. L. Rev. 406 (1977) (referred to hereinafter as Antenuptial Agreements).

Although prior Georgia decisions have upheld antenuptial agreements in which a spouse waived his or her rights in the other spouse's estate at death, *Nally v. Nally,* 74 Ga. 669 (1885); *Holmes v. Liptrot,* 8 Ga. 279 (1850), antenuptial agreements in contemplation of divorce have been held invalid on the ground that such agreements are contrary to the policy of this state to hinder facility in the procurement of divorces. *Reynolds v. Reynolds,* 217 Ga. 234 (6) (123 SE2d 115) (1961) and cits.

However, with the advent of no-fault divorce laws and the changes in society which such laws represent, courts in other jurisdictions have begun re-evaluating the question of whether antenuptial agreements in contemplation of divorce should be enforced.

As stated in the leading decision of Posner v. Posner, 233 S2d 381, 384 (Fla. 1970), and as quoted with approval in Buettner v. Buettner, 505 P2d 600, 603 (Nev. 1973):

" 'There can be no doubt that the institution of marriage is the foundation of the familial and social structure of our Nation and, as such, continues to be of vital interest to the State; but we cannot blind ourselves to the fact that the concept of the "sanctity" of a marriage — as being practically indissoluble, once entered into — held by our

ancestors only a few generations ago, has been greatly eroded in the last several decades. This court can take judicial notice of the fact that the ratio of marriages to divorces has reached a disturbing rate in many states . . .

" 'With divorce such a commonplace fact of life, it is fair to assume that many prospective marriage partners whose property and familial situation is such as to generate a valid antenuptial agreement settling their property rights upon the death of either, might want to consider and discuss also — and agree upon, if possible — the disposition of their property and the alimony rights of the wife in the event their marriage, despite their best efforts, should fail . . .

" 'We know of no community or society in which the public policy that condemned a husband and wife to a lifetime of misery as an alternative to the opprobrium of divorce still exists. And a tendency to recognize this change in public policy and to give effect to the antenuptial agreements of the parties relating to divorce is clearly discernible. Thus, in Hudson v. Hudson, Okl. 1960, 350 P2d 596, the court simply applied to an antenuptial contract respecting alimony the rule applicable to antenuptial contracts settling property rights upon the death of a spouse and thus tacitly, if not expressly, discarded the contrary-to-public-policy rule.' "

In Volid v. Volid, 286 NE2d 42, 46-47 (Ill. App. 1972), there also can be found a cogent statement of reasons for declining to follow the rule that all antenuptial agreements in contemplation of divorce are unenforceable:

"It is often declared that the state has a vital interest in the maintenance of the family, but this interest does not require that persons, once married, must live together forever without regard to the breakdown of their relationship. The necessity of granting divorces is recognized, and the grounds upon which one can be granted are expanding. Where no minor children are involved . . . and where the husband and wife can function in society separately and independently, the interest of the state in the continuance of the marriage is small.

"The most frequent argument made for holding [antenuptial agreements in contemplation of divorce] invalid is that such agreements encourage or incite divorce or separation. There is little empirical evidence to show that this assertion is well founded . . . It may be equally cogently argued that a contract which defines the expectations and responsibilities of the parties promotes rather than reduces marital stability. See dissent Fricke v. Fricke, 257 Wis. 124, 42 NW2d 500 . . .

"When the rules regarding the husband's duty of support were first enunciated, the roles of a husband and wife were more rigid and

defined. The husband worked and brought income into the family while the wife maintained and managed the household. The woman generally did not seek outside employment partly, because 'her place was in the home', and partly because few opportunities for meaningful employment were available. Married women nowadays are increasingly developing career skills and successfully entering the employment market. Where a woman is trained, healthy, and employable, and where a woman's efforts have not contributed to a husband's wealth or earning potential, the necessity for alimony award upon breakup of the marriage is not great.

"The reasons given to justify the invalidation of all antenuptial agreements which limit the obligation of support upon divorce do not warrant the condemnation of all such agreements in the name of public policy. . .

"[I]t would be anomalous to hold that the parties cannot plan and agree on a course of action in the event that the marriage is unsuccessful and ends in divorce. Particularly is this true where the parties are older and where there is little danger that either party would be without support. The incidence of divorce in this country is increasing, and consequently more persons with families and established wealth are in a position to consider the possibility of a marriage later in life. Public policy is not violated by permitting these persons prior to marriage to anticipate the possibility of divorce and to establish their rights by contract in such an event as long as the contract is entered with full knowledge and without fraud, duress or coercion."

We agree with the statements made in the foregoing decisions. Accordingly, we now overrule *Reynolds v. Reynolds,* 217 Ga. 234 (6), supra, and we hold that antenuptial agreements in contemplation of divorce are not absolutely void as against public policy.

3. In fact, in *Sanders v. Colwell,* 248 Ga. 376 (283 SE2d 461) (1981), we have recently abolished the "fine line of distinction" between postnuptial agreements incident to a divorce (which had been held to be enforceable) and postnuptial agreements, the object of which was the promotion of a dissolution of a marriage relation existing between the parties (which had been held to be unenforceable). *Beverly v. Beverly,* 209 Ga. 468 (1) (74 SE2d 89) (1953) and cits. "[W]e . . . declare that agreements in contemplation of divorce settling issues of alimony, property division, child custody, child support and visitation are not invalid. In so holding, we overrule *Warren v. Warren* [235 Ga. 234 (219 SE2d 161) (1975)] and its predecessors." *Sanders v. Colwell,* supra, 248 Ga. at p. 378. However, the question of whether a postnuptial agreement should be approved and incorporated into the parties' divorce decree remains within the

discretion of the trial judge. *Vereen v. Vereen,* 226 Ga. 500, 501 (175 SE2d 865) (1970) and cits.

In those jurisdictions which have begun enforcing antenuptial agreements in contemplation of divorce, it has been held that such contracts, as others, should not be given carte-blanche enforcement. Rather, the cases hold that the trial judge should employ basically three criteria in determining whether to enforce such an agreement in a particular case: (1) was the agreement obtained through fraud, duress or mistake, or through misrepresentation or nondisclosure of material facts? (2) is the agreement unconscionable? (3) Have the facts and circumstances changed since the agreement was executed, so as to make its enforcement unfair and unreasonable? See Tomlinson v. Tomlinson, 352 NE2d 785 (Ind. App. 1976); Buettner v. Buettner, 505 P2d 600, supra; Volid v. Volid, 286 NE2d 42, supra; Posner v. Posner, 257 S2d 530 (Fla. 1972); Posner v. Posner, 233 S2d 381, supra; Hudson v. Hudson, 350 P2d 596, supra; Prenuptial Contracts, supra; Antenuptial Agreements, supra.

We hold that when a superior court in this State is presented with an antenuptial agreement in a divorce proceeding, the foregoing criteria should be employed in determining whether to enforce the agreement.

4. The trial judge has found the agreement contained in the present case to be valid and enforceable, and under the record here we cannot say that he erred in so ruling. However, we do note that under this agreement the wife is not precluded from seeking alimony and satisfying this claim against assets of the husband other than the specified stock; nor is she precluded from seeking an equitable division of these other assets.

In addition, we note that an antenuptial agreement is a factor which should be taken into consideration in determining what is an equitable division of property. See Tomlinson v. Tomlinson, supra. And where, as here, the antenuptial agreement does not preclude assertion of an alimony claim by the wife, the assets retained by the husband by virtue of the agreement have a direct bearing on his ability to pay alimony. Therefore, the antenuptial agreement is relevant and admissible at the hearing on the alimony and/or property-division issues.

*Judgment affirmed. All the Justices concur, except Jordan, C.J., who dissents.*

DECIDED JUNE 22, 1982 —
REHEARING DENIED JULY 8, 1982.

*Savell, Williams, Cox & Angel, Henry Angel,* for appellant.

*Edward E. Bates, Jr., A. Paul Cadenhead,* for appellee.