Marcella EDWARDSON, Appellant,

v.

Arthur EDWARDSON, Appellee.

No. 89–SC–389–DG.

Supreme Court of Kentucky.

Nov. 8, 1990.

Scott A. Simon, Alfred J. Simon, Jr., Louisville, for appellant.

Raymond J. Naber, Jr., Naber, Joyner and Schardein, Louisville, for appellee.

LAMBERT, Justice.

Almost seventy-five years ago this Court declared "the law will not permit parties contemplating marriage to enter into a contract providing for, and looking to, future separation after marriage." *Stratton v. Wilson*, 170 Ky. 61, 185 S.W. 522, 523 (1916). In subsequent decisions we have adhered to the foregoing rule, although a fine distinction was drawn in *Jackson v. Jackson*, Ky., 626 S.W.2d 630 (1981), wherein the Court enforced an antenuptial agreement in a divorce action which required the husband to furnish the wife "a decent support during his natural life." See also *Sousley v. Sousley*, Ky., 614 S.W.2d 942 (1981). This Court granted appellant's motion for discretionary review to reconsider the position taken in *Stratton* and its progeny to determine whether the underlying policy is still valid; if not, whether other policy considerations have emerged making it desirable to retain the *Stratton* rule; or whether societal changes render its modification appropriate.

Prior to their marriage to each other, both parties had been married previously. In the divorce decree dissolving her prior marriage, appellant was awarded the sum of seventy-five dollars ($75.00) per week as maintenance, the payment of which was to

be terminated upon her remarriage. Appellant and appellee executed an agreement prior to the time their marriage was solemnized which contained, *inter alia*, the following provision:

"In the event that the marriage of the parties shall be dissolved or the parties become legally separated, to the extent permitted under Kentucky law or the state of residence where said action is filed, the Party of the First Part shall receive SEVENTY–FIVE DOLLARS ($75.00) per week as maintenance (alimony) from the Party of the Second Part for her life, or until her remarriage. Furthermore, Party of the Second Part shall maintain medical/hospitalization insurance for the Party of the First Part for her life or her remarriage, which insurance program shall have benefits substantially similar to those presently held by the Party of the First Part through the ROTHROCK INSURANCE SERVICE. Other than as provided in this paragraph, neither party shall have any obligation to the other for alimony or support, and neither party shall have any claim against the property of the other nor any claim thereto by reason of the marriage or the manner or cause thereto by reason of the marriage or the manner or cause of dissolution thereof, it being the intent hereof that the parties, each having adequate separate estates on the date of marriage, shall each retain their separate estates, any increase in the value thereof and accretions thereto, free of any and all claims or interest in property or other rights which may come into existence or arise by reason of the marriage of the parties hereto, except as stated herein."

After about two and a half years of marital turbulence, the parties finally separated. In the divorce action which followed, appellant sought enforcement of the agreement. Enforcement was denied in the trial court and on appeal the judgment of the trial court was affirmed. The courts below relied upon the principles set forth in *Stratton v. Wilson, supra,* for their decisions.

From the facts just stated, the precise issue which emerges is whether parties may enter into an enforceable agreement in advance of their marriage for the amount of maintenance to be paid by one to the other in the event the marriage is dissolved. The larger issue before the Court is whether any antenuptial agreement which contemplates divorce and provides for the payment of maintenance and the disposition of property upon subsequent dissolution of the marriage is enforceable.

We begin our discussion by observing that *Stratton v. Wilson* contains many facts in common with the case at bar and as such, note that the courts below were bound by its holding. SCR 1.030(8)(a) and SCR 1.040(5). Thus, our decision to review this case and our decision on the merits implies no criticism of the decisions of the lower courts.

In unmistakable terms, the Court in *Stratton* held the portion of the agreement which provided for payment of alimony in the event of separation or divorce to be void. The decision was based on the view that such an agreement was destabilizing to the marital relationship and might promote or encourage marital breakup.

It is an indisputable fact that since rendition of our decision in *Stratton,* the incidence of divorce in Kentucky has followed the national experience and risen steadily. Further, the Kentucky General Assembly has abandoned the fault-based system of allowing dissolution of marriage which prevailed prior to 1972 and adopted portions of the Uniform Marriage and Divorce Act which is substantially a "no-fault" marriage dissolution system. A legislative determination has been made that abandoning the necessity of proving fault would, *inter alia,* "[s]trengthen and preserve the integrity of marriage and safeguard family relationships." KRS 403.110(1). While the rising incidence of divorce and the existence of profound legislative changes do not *per se* render the *Stratton* rule invalid, neither do they support its continuation. Unless the continued validity of this rule of law which restricts the rights of parties and is subject to change without disrupting

settled expectations [1] can be demonstrated or reasonably assumed, it should not be blindly followed. In view of the foregoing, it is appropriate to re-examine *Stratton* to determine whether such a broad restriction is necessary to promote the substantial state interest in marital stability. KRS 403.110.

A number of other jurisdictions have confronted the question before this Court and abandoned or modified the prohibition against enforcement of antenuptial agreements which contemplate divorce. In a leading decision, *Posner v. Posner*, 233 So.2d 381 (Fla.1970), the Supreme Court of Florida reviewed a number of authorities and noted a "clearly discernible" trend in favor of enforcing antenuptial agreements. The Court observed that in some circumstances, the existence of an antenuptial agreement might actually promote the continuation of marriage rather than its dissolution and further noted the widespread enforcement of antenuptial agreements to settle property rights upon the death of a spouse. Abandoning its prior rule, the Court held that such agreements should no longer be void *ab initio*, but should be measured by the stringent standards prescribed in *Del Vecchio v. Del Vecchio*, 143 So.2d 17 (Fla.1962), for agreements which settle property rights on the death of a spouse, and the additional requirement that it not appear the agreement promoted procurement of the divorce. In another leading case, *Scherer v. Scherer*, 249 Ga. 635, 292 S.E.2d 662 (1982), the Supreme Court of Georgia overruled its prior decisions holding antenuptial agreements in contemplation of divorce invalid. As grounds for its decision, the Court recognized that divorce is a commonplace fact of life, that state law and public policy permit married persons to obtain divorces, and the absence of empirical evidence to show that antenup-

tial agreements in contemplation of divorce actually encourage or incite divorce. Decisions from other jurisdictions relying upon the reasons set forth in *Posner* and *Scherer* and upholding the validity of antenuptial agreements which contemplate divorce include *Marriage of Dawley*, 17 Cal.3d 342, 131 Cal.Rptr. 3, 551 P.2d 323 (1976), *Buettner v. Buettner*, 89 Nev. 39, 505 P.2d 600 (1973), *Barnhill v. Barnhill*, 386 So.2d 749 (Ala.Civ.App.1980), *Volid v. Volid*, 6 Ill. App.3d 386, 286 N.E.2d 42 (1972), *Tomlinson v. Tomlinson*, 170 Ind.App. 331, 352 N.E.2d 785 (1976), *In Re Marriage of Ingels*, 42 Colo.App. 245, 596 P.2d 1211 (1979), and *Parniawski v. Parniawski*, 33 Conn.Supp. 44, 359 A.2d 719 (1976).

While the foregoing cases present differing factual circumstances and subtle differences in the legal issues addressed and answered, a common theme may be found throughout. The notion that divorce is promoted by an antenuptial agreement which contemplates such a possibility has been rejected and the right of parties to enter into appropriate agreements has been upheld. We concur with this view.

Finally, we observe that the legal status of marriage partners is vastly different today than it was when *Stratton v. Wilson* was decided. At that time the Nineteenth Amendment to the Constitution of the United States had not yet been ratified, married women's property acts were not yet in existence or were in their infancy, and in general the status of women in this society was decidedly second class. In 1916 it may have been entirely logical to restrict the nature of agreements available to persons contemplating marriage in an effort to avoid marital instability. Subsequent changes in society and seventy-five years of experience have rendered such restric-

---

**1.** This Court cannot forsee any disruption of reasonable expectations arising out of our decision. While a certain class of agreements which would have been unenforceable heretofore may now be enforceable, in every instance enforcement will be sought against a party who freely entered into a written agreement. Such a party should not be heard to attempt avoidance on the grounds that he did not expect enforce-

ment. Parties who have observed or exceeded the *Stratton/Jackson* parameters will have their expectations fulfilled. We should not retain a rule of law or make its application prospective only simply because some may not have had an opportunity to enter into such a contract. For a detailed discussion of this issue, see L. Carter, *Reason in Law*, "Common Law," pp. 150–164.

tions inappropriate. The words of Justice Holmes are appropriate here:

"The life of the law has not been logic; it has been experience. The felt necessities of the time, the prevalent moral and political theories, intuitions of public policy, avowed or unconscious, even the prejudices which judges share with their fellow-men, have had a good deal more to do than the syllogism in determining the rules by which men should be governed." Holmes, *The Common Law* (1881); Harvard Univ. Press (1963).

From the foregoing, we are unable to conclude that the *ratio decidendi* for *Stratton* remains valid.

It may be argued that despite the invalidity of the reasons underlying the *Stratton* rule, other grounds have emerged which render it desirable to refrain from changing the rule. In 1972, the Kentucky General Assembly adopted a comprehensive act which defined the rights of parties upon the dissolution of their marriage. KRS 403.010 *et seq.* Rules were established for the division and assignment of marital and non-marital property, rules were established for the award, duration and amount of maintenance, and rules were established for the custody and support of children. Since adoption of the 1972 Act, the appellate courts of this Commonwealth have decided numerous cases creating a substantial body of decisional law. The question we must answer now is whether parties contemplating marriage should be entitled, by antenuptial agreement, to rewrite the comprehensive act of the General Assembly and nearly twenty years of appellate court decisions.

Throughout the law parties are permitted to enter into agreements which modify the result which would obtain if the matter was finally litigated. We freely permit competent parties to settle civil lawsuits upon whatever terms they chose. To a lesser degree courts approve the settlement of criminal litigation by permitting guilty pleas and recommendations by the prosecuting authority. Indeed, this Court has recently amended RCr 8.10 to permit a defendant an absolute right to withdraw a guilty plea in the event the trial court fails to sentence in accordance with the plea agreement. It could be argued that such permits parties to avoid the law by agreement. In the area of domestic relations, antenuptial agreements have been enforced which provide for distribution of assets upon the death of a spouse (*Lipski v. Lipski*, Ky., 510 S.W.2d 6 (1974)), and our statutes encourage parties involved in domestic litigation to enter into separation agreements. KRS 403.180. To conclude that parties should also be permitted to make antenuptial agreements for disposition of property and payment of maintenance in the event the marriage is dissolved requires only a short step. Indeed, KRS 403.190(2)(d) may be read to expressly authorize antenuptial agreements in contemplation of divorce. See *Volid v. Volid*, *supra*. We believe that step should now be taken, subject to appropriate limitations.

 The first limitation upon parties to an antenuptial agreement is the requirement of full disclosure. . Before parties should be bound by agreements which affect their substantial rights upon dissolution of marriage, it should appear that the agreement was free of any material omission or misrepresentation. *Jackson v. Jackson*, *supra*, and *Simpson v. Simpson's Ex'rs*, 94 Ky. 586, 23 S.W. 361 (1893). The second limitation to be observed is that the agreement must not be unconscionable at the time enforcement is sought. Regardless of the terms of the agreement and regardless of the subsequent acquisition or loss of assets, at the time enforcement is sought, the court should be satisfied that the agreement is not unconscionable.[2] Upon a finding of unconscionability, the trial court entertaining such an action may modify the parties'

---

**2.** Upon review of a post-nuptial separation agreement entered into pursuant to KRS 403.180, the trial court must determine whether the agreement is unconscionable. A number of Kentucky decisions have addressed the construction of this term and we need not attempt further refinement in this opinion. The concept of unconscionability is familiar to circuit courts by virtue of KRS 403.180 and KRS 403.250.

agreement to satisfy the necessary standard, but should otherwise give effect to the agreement as nearly as possible providing the agreement was not procured by fraud or duress.

While it may go without saying, we observe that antenuptial agreements may apply only to disposition of property and maintenance. Questions of child support, child custody and visitation are not subject to such agreements; and unless the parties otherwise agree, non-marital property retains its character as such.

We recognize that this opinion may raise a number of questions. No effort has been made to write a comprehensive treatise which answers all the questions likely to arise. The ingenuity of persons contemplating marriage to fashion unusual agreements, particularly with the assistance of counsel, cannot be overestimated. We will observe the tradition whereby the law develops on a case by case basis. It should be recognized, however, that trial courts have been vested with broad discretion to modify or invalidate antenuptial agreements. Parties and their counsel should be admonished to refrain from entering into agreements lacking mutuality and without a rational basis. Courts reviewing antenuptial agreements and faced with a claim of unconscionability should not overlook the wisdom, which is fully applicable to both spouses, expressed in this Court's decision rendered in *Clark v. Clark*, 301 Ky. 682, 192 S.W.2d 968, 970 (1946):

> "A separation agreement will be closely scrutinized by a court of equity, .... It must appear that the husband exercised the utmost good faith; that there was a full disclosure of all material facts, including the husband's circumstances and any other fact which might affect the terms of the contract; and that the provisions made in the agreement ... were fair, reasonable, just, equitable, and adequate in view of the conditions and circumstances of the parties ....."

For the reasons stated, we reverse and remand this cause to the Jefferson Circuit Court for further proceedings consistent herewith.

STEPHENS, C.J., and GANT and LEIBSON, JJ., concur.

COMBS, J., concurs by separate opinion.

VANCE, J., dissents by separate opinion in which WINTERSHEIMER, J., joins.

COMBS, Justice, concurring.

I concur in the result. For reasons stated in my concurring opinion in *Gentry v. Gentry*, Ky., 798 S.W.2d 928 (1990), rendered today, I believe that the General Assembly has provided for enforcement of antenuptial agreements not unconscionable and not otherwise limited by statute.

VANCE, Justice, dissenting.

I respectfully dissent because I consider the majority opinion to be nothing less than legislation by the judiciary. The General Assembly of Kentucky is the representative of the people and has the responsibility to declare public policy.

Occasionally, an issue of public policy will arise in litigation with reference to a situation in which the legislature has not declared a policy. In such a vacuum it falls to the court to declare the policy. Such judicially declared policy then becomes the public policy of the state until the General Assembly exercises its prerogative to declare otherwise.

So it was that in *Stratton v. Wilson* the court declared a prenuptial agreement looking toward a future separation after marriage void as against public policy. That declared policy has remained in effect since 1916. The legislature has had many opportunities to declare a different policy but has not done so. It is a policy which has now been accorded legislative approval by the fact that it has existed for so many years without repudiation by the General Assembly.

The majority opinion states that review in this case was granted in order that this court might determine whether the long-es-

tablished public policy was still valid or whether other "policy" questions have emerged.

This would be well and good if a proper function of this court were the making and changing of public policy. Policy making and policy changing, however, is a function of the General Assembly, not this court.

Without regard to whether this new policy now legislated by this court is a good or a bad policy, the proposed change is a matter which should have been left to the General Assembly. I am constantly amazed at the unseeming eagerness of this court to undermine the separation of powers which is provided by our constitution and to arrogate unto itself the duty not only to interpret the law, but to enact it as well.

WINTERSHEIMER, J., joins in this dissenting opinion.