RINVELT v RINVELT

Docket No. 124867. Submitted June 12, 1991, at Grand Rapids. Decided July 22, 1991, at 9:40 A.M.

Donna L. Rinvelt and Arnold L. Rinvelt were granted a divorce in the Kent Circuit Court, Dennis C. Kolenda, J. Arnold Rinvelt appealed, contending that the court erred in strictly enforcing an antenuptial agreement that governed the distribution of the marital estate in the event of a divorce.

The Court of Appeals *held:*

Antenuptial agreements governing the division of property in the event of a divorce are enforceable in Michigan if legally procured and ostensibly fair in result. An agreement must not have been obtained through fraud, duress or mistake, or misrepresentation or nondisclosure of material facts and must not have been unconscionable when executed. In addition, the facts and circumstances must not have changed since the agreement was executed that would make its enforcement unfair and unreasonable. The outdated public policy concerns that once led courts to refuse to enforce antenuptial agreements are no longer compelling.

The agreement in this case was legally procured and ostensibly fair in result, and the trial court evaluated the relevant considerations. The court did not abuse its discretion in enforcing the antenuptial agreement.

Affirmed.

1. DIVORCE — ANTENUPTIAL AGREEMENTS — VALIDITY.

Antenuptial agreements governing the division of property in the event of a divorce are enforceable if legally procured and ostensibly fair in result; an agreement must not have been obtained through fraud, duress or mistake, or misrepresentation or nondisclosure of material facts, and must not have been unconscionable when executed; in addition, the facts and circumstances must not have changed since the agreement was

REFERENCES

Am Jur 2d, Divorce and Separation §§ 19, 172.

See the Index to Annotations under Antenuptial Contracts and Agreements.

executed that would make its enforcement unfair and unreasonable.

2. DIVORCE — ANTENUPTIAL AGREEMENTS — VALIDITY — BURDEN OF PROOF.

The party challenging enforcement of an antenuptial agreement governing the division of property in the event of a divorce bears the burden of proof and persuasion.

*Miller, Johnson, Snell & Cummiskey* (by *Richard Postma* and *James R. Peterson*), for the plaintiff.

*Rhoades, McKee, Boer, Goodrich & Titta* (by *Roger W. Boer*), for the defendant.

Before: GRIBBS, P.J., and HOOD and GRIFFIN, JJ.

GRIFFIN, J. Defendant, Arnold Lee Rinvelt, appeals as of right from a December 29, 1989, judgment of divorce entered by the Kent Circuit Court. As his sole issue on appeal, defendant contends that the circuit court erred in strictly enforcing an antenuptial agreement that contained provisions governing distribution of the marital estate in the event of divorce. We disagree and hold that such provisions, with certain limitations, are enforceable in Michigan.

I

The facts of the instant case are simple and straightforward. The parties were married on July 23, 1983. Three days before the marriage, on July 20, 1983, the parties entered into an antenuptial agreement drafted by defendant's attorney. Among other things, the agreement contained the following provisions relative to the parties' property and its distribution in the event of divorce:

3. *Property rights subsequent to marriage:* After the solemnization of the marriage between the

parties, and except as hereinafter provided, each of the parties shall separately retain all rights in his or her own property, whether now owned or hereafter acquired, and, except as otherwise herein provided, each of them shall have the absolute and unrestricted right to dispose of such property free from any claims that may be made by the other by reason of their marriage, and with the same effect as if no marriage had been consummated between them.

\* \* \*

11. *Divorce:* In the event that the marriage of the parties shall end in divorce, annulment, or separate maintenance, it is hereby agreed that their respective rights in and to the property of the other spouse shall be limited as follows:

A. The Prospective Husband shall be entitled to ten percent (10%) of the net estate of the Prospective Wife, net estate meaning gross estate less all expenses.

B. The Prospective Wife shall be entitled to ten percent (10%) of the net estate of the Prospective Husband, net estate meaning gross estate less all expenses.

The parties understand that contractual provisions which attempt to deal with the event of divorce prior to the contemplation of divorce are often deemed to be in contravention of public policy. In recognition of this fact, the parties desire that the provisions of this Agreement shall be severable, and intend, that, in the event that the provisions dealing with divorce shall be found to be repugnant to public policy, then said provisions shall be severed from the remainder of this Agreement, and shall be rendered of no further force or effect.

Plaintiff filed for divorce on December 15, 1987. Following a four-day trial, the circuit court entered a judgment of divorce and enforced the antenuptial agreement. Pursuant to the above provisions, each party was awarded ten percent of

the other's estate. The net result, after accounting for certain credits and deductions, was an award in favor of plaintiff in the amount of $228,584.79.

II

On appeal, defendant argues that the trial court should not have enforced the antenuptial agreement. Initially, we note that we find defendant's position troubling in view of the fact that it was he who had the agreement prepared. We further note that the exact tenor of defendant's argument is unclear. It is not clear whether defendant wants us to hold that all antenuptial agreements are contrary to public policy, or simply that enforcement of the instant agreement was somehow inequitable. In any case, we are persuaded that neither argument has merit.

On several occasions, our Supreme Court has had the opportunity to discuss generally the validity of antenuptial agreements. These cases, however, have been limited to the issue of the enforceability of antenuptial agreements that attempt to limit the property rights of one spouse in the event of the other's death. None of them conclusively resolves the issue at hand. Nonetheless, we find them helpful.

In *Scherba v Scherba,* 340 Mich 228; 65 NW2d 758 (1954), the parties signed an antenuptial agreement providing that in the event of the plaintiff's death, the defendant would receive $1,000 cash and a life estate in the parties' marital home. When the parties divorced, the trial court used the agreement as a guide in dividing the marital estate. Accordingly, the defendant was awarded $1,000 in cash plus the present value of her life estate in the home, "giving her, in effect, what she would have received under the antenup-

tial agreement had plaintiff predeceased her at that time." *Id.,* p 230. In rejecting the plaintiff's challenge to this result, the Supreme Court reasoned:

> The question of whether defendant is entitled to specific performance of such antenuptial agreement is not before the court in a divorce suit. The court granted the wife a decree of divorce because of the extreme and repeated cruelty of the husband and in so doing was empowered and required to make such provisions for alimony and property settlement for the wife as the court deemed equitable and just. CL 1948, § 552.23 *et seq.,* § 552.101 *et seq.* (Stat Ann and Stat Ann 1953 Cum Supp § 25.103 *et seq.,* § 25.131 *et seq.*); *Mayer v Mayer,* 266 Mich 241 [253 NW 282 (1934)]; *Robinson v Robinson,* 275 Mich 420 [266 NW 403 (1936)]; *Montgomery v Montgomery,* 221 Mich 31 [190 NW 687 (1922)]. That the trial court may have viewed the agreement of parties as to what provision should be made for defendant in the event the marriage were terminated by plaintiff's death as some sort of guide as to what would be a just and equitable provision for her when the marriage was terminated by plaintiff's cruelty does not seem to us necessarily amiss. That did not amount to specific performance of the antenuptial agreement inasmuch as its provisions related to the situation which would result from plaintiff's predeceasing defendant and not to the one resulting from their divorce; nor would it accord with public policy to permit enforcement of an antenuptial agreement if its provisions actually did undertake to govern as to property settlement or alimony in the event of a divorce. See 70 ALR 826. We hear the case de novo. On the record presented we do not find the provisions of the decree for the defendant unjust or inequitable to either party. On the basis of that, the only applicable test, the decree is affirmed, with costs to defendant. [*Id.* p 231.]

Later, in *In re Muxlow Estate,* 367 Mich 133;

116 NW2d 43 (1962), the Court was again faced with an antenuptial agreement purporting to limit a surviving spouse's claim in the event of the other's death. In *Muxlow,* the agreement provided in part that the surviving spouse relinquished any and all claims to the deceased spouse's estate. In affirming the validity of this arrangement, the Court noted that "[a]ntenuptial agreements are expressly authorized by statute" in this state, citing what is now MCL 557.28; MSA 26.165(8). *Id.,* p 134. The Court further noted that it had not been shown that the agreement was void as a matter of public policy as tending to facilitate or induce separation or divorce. In pertinent part, the Court's opinion reads:

> Nothing in the agreement can be said to make separation or divorce more attractive to either party, notwithstanding the apparent interpretation given to the agreement by the parties themselves following their separation. See annotation 57 ALR2d 942. Had one of the parties to the agreement sought divorce, the chancellor would not have been bound by anything in the agreement in dividing the property of the parties or in awarding alimony and other rights, if in his judgment the equities so required.
> 
> Accordingly, since it cannot be held that any effective provision of this agreement provided for, facilitated, or tended to induce a separation or divorce, the agreement was not against public policy, and the judgment of the circuit court affirming its validity is, therefore, affirmed. Costs may be taxed in favor of appellee. [*Id.,* p 137.]

The Supreme Court's most recent discussion of antenuptial agreements is found in *In re Benker Estate,* 416 Mich 681; 331 NW2d 193 (1982). Like the cases discussed above, *Benker* concerned that portion of an antenuptial agreement purporting to

limit the surviving spouse's property rights upon the death of the other spouse. The following observations from *Benker* are relevant here:

> It is now generally recognized that antenuptial agreements which relate to the parties' rights upon the death of one of the parties are favored by public policy. MCL 557.28; MSA 26.165(8) recognizes such contracts and provides that:
> "A contract relating to property made between persons in contemplation of marriage shall remain in full force after marriage takes place."
> Such agreements, while recognized as valid instruments, are of a special nature because of the fact that they originate between parties contemplating marriage. This relationship is one of extreme mutual confidence and, thus, presents a unique situation unlike the ordinary commercial contract situation where the parties deal at arm's length.
> In order for an antenuptial agreement to be valid, it must be fair, equitable, and reasonable in view of the surrounding facts and circumstances. It must be entered into voluntarily by both parties, with each understanding his or her rights and the extent of the waiver of such rights. *Hockenberry v Donovan,* 170 Mich 370, 380; 136 NW 389 (1912). Antenuptial agreements give rise to a special duty of disclosure not required in ordinary contract relationships so that the parties will be fully informed before entering into such agreements. [*Id.,* pp 688-689.]

From these cases, several general principles can be distilled. At least in cases involving the property rights of one spouse upon the death of the other, antenuptial agreements are enforceable, and in fact are favored as a matter of public policy. *Id.,* p 688. However, such agreements are not enforceable if they provide for, facilitate, or tend to induce a separation or divorce. *Muxlow, supra,* p 134. Furthermore, the agreement must be fair, equitable, and reasonable under the circum-

stances, and must be entered into voluntarily, with full disclosure, and with the rights of each party and the extent of the waiver of such rights understood. *Benker, supra.* See also *In re Halmaghi Estate,* 184 Mich. App 263; 457 NW2d 356 (1990). In addition, the agreement should be free from fraud, lack of consent, mental incapacity, or undue influence. See, generally, *Richard v Detroit Trust Co,* 269 Mich 411; 257 NW 725 (1934); *Kennett v McKay,* 336 Mich 28, 30; 57 NW2d 316 (1953). Finally, where the agreement is challenged, the burden of proof and persuasion is on the party challenging its validity. *Benker, supra,* p 684.

III

The question now before us is whether we should extend these principles to antenuptial agreements that contemplate divorce rather than simply the death of one of the parties. To our knowledge, no Michigan case has specifically held that antenuptial agreements are enforceable in the context of a divorce. We now hold that they are.

At the outset, we acknowledge the dicta in *Scherba* that states that it would not "accord with public policy" to enforce an antenuptial agreement that undertook to govern the property settlement in the event of divorce. We decline, however, to adopt this statement as law or to otherwise deem it controlling. Rather, we conclude that the outdated policy concerns that once led courts to refuse to enforce antenuptial agreements are no longer compelling.

The Alaska Supreme Court in *Brooks v Brooks,* 733 P2d 1044 (Alas, 1987), comprehensively discussed the evolving public policy considerations that now justify enforcing antenuptial agreements:

The traditional common law view was that prenuptial agreements in contemplation of divorce (hereinafter prenuptial agreements) were inconsistent with the sanctity of marriage and the state's interest in preserving marriage and maintaining the financial security of divorced persons. E.g. *Scherer v Scherer,* 249 Ga 635 [638; 292 SE2d 662] (1982); see generally Note, *For Better or for Worse . . . But Just in Case, Are Antenuptial Agreements Enforceable?,* U Ill L Rev 531, 534 (1982). Courts uniformly viewed these agreements as inherently conducive to divorce and as allowing a husband to circumvent his legal duty to support his wife. Thus, prior to 1970, prenuptial agreements that stipulated terms regarding alimony and property settlements upon divorce were almost universally considered void ab initio as contrary to public policy. E.g. *Marschall v Marschall,* 195 NJ Super 16 [22; 477 A2d 833] (1984); see also 2 Lindey, Separation Agreements and Antenuptial Contracts, § 90 at 90-93 (1983).

Since 1970, however, public policy has changed markedly. Freed & Walker, *Family Law in the Fifty States: An Overview,* 19 Fam Law Q 331, 438 (1985-86) (hereinafter "Overview"). With the advent of no-fault divorce laws and the changes in society such laws represent, the traditional rule has rapidly given way to the more realistic view that prenuptial agreements are not void ab initio but are valid and enforceable if certain standards of "fairness" are met. *Id.* Although the standards vary from state to state, the following three criteria are typically considered:

1. Was the agreement obtained through fraud, duress or mistake, or misrepresentation or nondisclosure of material fact?

2. Was the agreement unconscionable when executed?

3. Have the facts and circumstances changed since the agreement was executed, so as to make its enforcement unfair and unreasonable?

*Scherer* [249 Ga 641] (citations omitted). If none of the above factors are present, prenuptial agree-

ments have generally been accorded judicial recognition. E.g. *Id.*

\* \* \*

[T]he idea that prenuptial agreements induce divorce is anachronistic. Today, divorce is a "common-place fact of life." *Posner* [*v Posner,* 233 So 2d 381, 384 (Fla, 1970)]. As a result there is a concurrent increase in second and third marriages—often of mature people with substantial means and separate families from earlier marriages. The conflicts that naturally inhere in such relationships make the litigation that follows even more uncertain, unpleasant and costly. Consequently, people with previous "bad luck" with domestic life may not be willing to risk marriage again without the ability to safeguard their financial interests. In other words, without the ability to order their own affairs as they wish, many people may simply forgo marriage for more "informal" relationships.

Prenuptial agreements, on the other hand, provide such people with the opportunity to ensure predictability, plan their future with more security, and, most importantly, decide their own destiny. Moreover, allowing couples to think through the financial aspects of their marriage beforehand can only foster strength and permanency in that relationship. In this day and age, judicial recognition of prenuptial agreements most likely "encourages rather than discourages marriage." *Gant* [*v Gant,* 329 SE2d 106, 112-113 (W Va, 1985)].

In sum, both the realities of our society and policy reasons favor judicial recognition of prenuptial agreements. . . . [W]e see no logical or compelling reason why public policy should not allow two mature adults to handle their own financial affairs. Therefore, we join those courts that have recognized that prenuptial agreements legally procured and ostensibly fair in result are valid and can be enforced.[1] "The reasoning that once found them contrary to public policy has no place in

---

[1] The *Brooks* court, *supra,* p 1050, n 16, cited cases indicating that courts in the following other states have judicially recognized the validity of antenuptial agreements:

today's matrimonial law." *Marschall* [195 NJ Super 28]. [*Id.,* pp 1048-1051.]

We agree with this well-reasoned analysis and hold that antenuptial agreements governing the division of property in the event of divorce are enforceable in Michigan. The party challenging the agreement bears the burden of proof and persuasion. Further, we view the limitations with regard to such agreements as set forth in *Brooks* to be consistent with prior Michigan law governing antenuptial agreements after death. Accordingly, we now apply these principles and limitations to antenuptial agreements governing the division of property in the event of divorce.

IV

As a final matter, we must briefly address that portion of defendant's argument in which he contends that the trial court should not have enforced the antenuptial agreement in this case. In this regard, defendant argues that "total enforcement of the antenuptial contract discounts any equitable factors involved in this case." This argument has no merit. A review of the court's opinion in which it found that the agreement was enforceable reveals that the trial court thoroughly evaluated the relevant considerations. Upon review, we are not convinced that the trial court abused its discretion, *Beason v Beason,* 435 Mich 791, 798; 460 NW2d 207 (1990), or that we would have reached a different result had we occupied the position of the trial court. *Burkey v Burkey (On Rehearing),* 189 Mich

Arkansas, California, Colorado, Connecticut, Florida, Georgia, Hawaii, Illinois, Kansas, Maryland, Massachusetts, Minnesota, Missouri, New Jersey, Ohio, Oklahoma, Oregon, Washington, West Virginia, Wisconsin.

App 72; 471 NW2d 631 (1991). Accordingly, we affirm the enforcement of the antenuptial agreement.

Affirmed.