IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
September 20, 2002 Session

## VERNESSA EKELEM
v.
## IFEATU "IFY" EKELEM

**Appeal from the Chancery Court for Madison County**
**No. 56951      Ron E. Harmon, Chancellor**

**No. W2001-02986-COA-R3-CV - Filed April 16, 2003**

This is a divorce case.  Both parties are physicians.  Both have children from previous marriages, and they have three children together.  The parties' three children were minors at the time of the divorce hearing.  The father earned substantial income in 1996, which fell precipitously when he started his own medical practice in 1998.  His medical practice, however, owns luxury vehicles, and the father owns a large home with significant acreage.  The trial court found the father's earning capacity to be at the level of the mother's income, set child support based on that earning capacity, and established the father's parenting time with the parties' children.  The father was ordered to assume the parties' tax debt, and to cease making derogatory remarks about the mother.  On appeal, the father argues that the trial court erred in setting child support, in setting parenting time, in assigning the tax liability to him, and in enjoining him from making derogatory comments about the mother.  We affirm as modified, and remand, awarding the mother attorney's fees for this appeal.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed as Modified and Remanded**

HOLLY KIRBY LILLARD, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

Ifeatu Ekelem, College Grove, Tennessee, Pro Se.

James F. Butler, Jackson, Tennessee, for appellee, Vernessa Ekelem.

## OPINION

Plaintiff/Appellee Vernessa Ekelem ("Mother") and Defendant/Appellant Ifeatu Ekelem ("Father") were married in February 1995. Mother is a pediatrician, Father is a neonatologist.[1] Father has three children from a previous marriage; Mother has two children from a previous marriage. Prior to their marriage, the parties entered into a prenuptial agreement which provided, inter alia, that in the event of divorce, the parties would retain their separate property, refrain from seeking spousal support, including alimony and attorney's fees, each be responsible for his or her own federal income tax liability, and if they had any children, to seek a joint custody arrangement.

Mother and Father had three children together. In January 2000, Mother filed for legal separation, citing irreconcilable differences. Father counter-claimed for divorce. At the time of the divorce hearing, Father was forty-seven years old, Mother was forty-two years old, and their children were ages six, five, and two. Mother sought custody of the children as well as child support.

On January 25, 2000, the trial court awarded temporary custody to Mother. She was later awarded $1,100 per month in temporary child support. On October 24, 2000, the trial court awarded Father parenting time with the parties' children. The children were to see him on alternate weekends and on every Wednesday from 1:00 p.m. to 7:00 p.m.

An Interim Decree of Absolute Divorce was entered on January 12, 2001. The remaining issues were reserved for the final hearing on the parties' divorce.

Prior to the hearing, a myriad of motions were filed by both parties. Among the motions, Father moved to have Chancellor Joe Morris recuse himself from the case, arguing that his prior orders indicated that he was biased. Initially, Chancellor Morris declined to recuse himself, but decided to do so after Father filed suit against him in federal court.[2] Chancellor Ron Harmon was subsequently appointed to hear the case.

On October 5, 2001, Mother filed an emergency motion to terminate Father's parenting time with the children. In the motion, Mother alleged that Father, during his parenting time with the children, left them unsupervised in a public park. Mother said that she was contacted by the police department to retrieve the children from the park. That day, the trial court issued a temporary restraining order, enjoining Father from coming about Mother and terminating his parenting time with the children pending a hearing. Prior to the hearing, Father filed a response to Mother's motion to terminate visitation in which he asserted that the children were being supervised at the park by another adult. On October 16, 2001, after hearing the parties' arguments, the trial court suspended Father's parenting time privileges with the children until the final hearing on all remaining issues, set for November 14, 2001.

---

[1]A neonatologist is a pediatrician with additional training to treat newborn babies.

[2]The record does not indicate on what grounds Father sued the Chancellor.

Prior to the final hearing on all remaining issues, the parties agreed that the only personal property at issue was a joint tax debt owed to the Internal Revenue Service ("IRS"). Thus, the issues to be determined at trial were the tax debt, child support, custody, and parenting time.

The hearing was held on November 14, 2001, as scheduled. The evidence showed that Mother is employed as a pediatrician for Methodist West Tennessee Medical Associates. In this position, she earns $121,000 per year.

The evidence showed that in 1996, Father, then in practice as a neonatologist, had a net income, after taxes, of $219,828. In 1998, Father started his own medical practice, Pediatrics 24. Father's tax returns showed that, in 1998, he had a net loss of $48,628. Father's subsequent tax returns showed a net income in 1999 of $21,494, and in 2000 a net income of $21,530.

Both Mother and Father testified at the hearing. Father proceeded at the trial pro se.[3] Father acknowledged that his income as listed on his tax returns for 1998-2000 was drastically reduced from his 1996 income, prior to opening Pediatrics 24. Father testified that, despite this drastic reduction in his income, he maintained Pediatrics 24 with offices in Jackson, Tennessee and Martin, Tennessee. Moreover, he acknowledged that he owned outright a 39.75 acre parcel of land in College Grove, Tennessee, and said that he had been building a 4,500 square foot home on the property for many years, but that the home was not yet complete. Father explained that the home in College Grove was considered "corporate headquarters" for his medical practice. He said that Pediatrics 24 had purchased two Toyota Land Cruiser vehicles, with monthly notes totaling almost $2,000. Father admitted that he also owned a 1995 GMC pickup truck, a 1993 Acura NSX sports car, and a 1988 Mercedes Benz. Father explained that Pediatrics 24 is owned by him and some of his children, all of whom were minors at the time of the trial, some younger than ten years old. He testified that he was over $80,000 in arrears in his child support obligation for his children from his prior marriage.

In 1996, the parties accrued a tax debt of approximately $51,000. With penalties and interest this increased to approximately $89,000. Although Father's tax returns for 1999 and 2000 claimed that he earned only approximately $21,000 each year, nevertheless, in 2001, Father paid the IRS $30,000 on the outstanding tax debt. When asked on cross-examination where he obtained this $30,000, Father explained that he had previously put his retirement savings into his medical practice, and that the practice paid him back these funds, which were then used to pay down his tax debt.

Father was also asked about derogatory comments he made about Mother to the parties' children. After being denied parenting time, Father admitted, he wrote a letter to his children stating: "Daddy will give this his very best shot—and I promise—no drug addict, prostitute will stand in the way! . . ." Father testified that this was "not really" a reference to Mother, but rather to Mother's brother and "all kind [sic] of people" who visited Mother.

---

[3]Father apparently was represented by counsel during a portion of the proceedings, but represented himself at trial and in this appeal.

Father's parenting plan proposed that he have custody of the children for six months of each year. Father proposed that, during months in which he had custody of the children, Mother would pay him $2,864 per month in child support, and in months in which Mother had custody of the children, he would pay her $458 per month.

Mother testified at the hearing as well. She noted that she was given an award by the American Academy of Pediatrics ("Academy") for her community service. Just prior to her receiving the award, Father sent a letter to the Academy accusing Mother of promiscuity, drug addiction, and adultery. Mother denied Father's allegations.[4]

At one time, the parties' children were being cared for by a nanny, at a cost of $200 per week. Father then asked Mother to pay him $200 each week for caring for his children in his office. Mother agreed to do so for a period of approximately six to eight months, but removed the children from Father's care after one child fell and hit her lip on an occasion on which Father had left the children unattended.

Mother testified that Father did not financially support the children until he was ordered to do so by a court. Moreover, he had been held in contempt for failing to honor his child support obligations.

Mother also testified about the parties' tax debt. She said that, in 1996, they had accrued a tax debt in the amount of $51,154. Penalties and interest had subsequently increased the amount of the debt to approximately $89,000. Mother introduced into evidence her 1996 W-2 forms, which showed that her taxes for that year had been withheld by her employers, thus indicating that the tax debt was for Father's earnings for 1996. When Father opened Pediatrics 24 in 1998, he asked Mother to help him with his tax burden. Mother agreed, and opened a joint checking account into which she transferred over $11,000 from her personal checking account.

Mother stated that when the children were with Father, they stayed either in Father's office, at Father's girlfriend's home, or at Father's unfinished residence in College Grove. She said that Father's office was unsuitable because it had only a couch as a sleeping area. When the children stayed at Father's College Grove residence, Mother said that they would return with numerous flea and tick bites. Mother testified that "inbred German Shepherds" roamed Father's College Grove property.

Mother testified that a neonatologist in the Jackson, Tennessee area could expect to earn between $300,000 to $450,000 per year. In contrast to the approximately $21,000 per year income claimed on Father's tax returns, Mother estimated Father's actual income was at least $150,000.

---

[4]Mother admitted that she had used marijuana both in college and in an isolated incident five years earlier, but testified unequivocally that she had not used drugs since that time. The record contained no evidence contrary to Mother's testimony.

Based on this income, Mother's proposed parenting plan requested that she be designated primary residential parent and be awarded $2,737 per month in child support for the parties' three children.

At the conclusion of the hearing, the trial court found that Father was voluntarily underemployed and that his earning capacity was equal to Mother's $6,005 per month income. Based on this earning capacity, the trial court made an upward adjustment in Father's child support obligation from $1,100 per month to $2,500 per month. The trial court also ordered Father to assume the remaining tax arrearage. Mother's parenting plan was adopted as well. Father was given "standard" alternate-weekend parenting time as well as other parenting time, provided he has a suitable place for the children to stay. The trial court noted that Father's unfinished College Grove residence and his medical clinic were not suitable. Finally, Father was ordered to cease making derogatory comments about Mother.[5] From this order, Father appeals.

On appeal, Father argues that the trial court erred in increasing his child support from $1,100 to $2,500 per month for the parties' three children. He contends that the tax liability was assigned to him in contravention of the parties' antenuptial agreement, and asserts that the trial court erred in limiting his parenting time with the children to only alternate weekends and in prohibiting him from making disparaging remarks about Mother.[6] Mother argues that the trial court's order should be affirmed, and requests her attorney's fees for this appeal.

Because this case was heard by a trial court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court below, unless the evidence preponderates against these findings. *See* Tenn. R. App. P. 13(d); ***Wright v. City of Knoxville***, 898 S.W.2d 177, 181 (Tenn. 1995). Questions of law are reviewed *de novo* without a presumption of correctness. ***Burlew v. Burlew***, 40 S.W.3d 465, 470 (Tenn. 2001) (citation omitted). The trial court is given wide discretion in making child custody determinations, and will not be reversed unless the evidence preponderates against the trial court's decision. ***Williams v. Williams***, No. W2001-00101-COA-R3-CV, 2002 Tenn. App. LEXIS 440, at *7 (Tenn. Ct. App. June 20, 2002) (citations omitted). Likewise, a trial court's distribution of marital debt is reviewed under an abuse of discretion standard. ***See Smith v. Smith***, No. W2002-00477-COA-R3-CV, 2003 Tenn. App. LEXIS 38, at *11 (Tenn. Ct. App. Jan. 15, 2003). A trial court abuses its discretion when it reaches a decision against logic that causes a harm to the complaining party or when the trial court applies an incorrect legal standard. ***Eldridge v. Eldridge***, 42 S.W.3d 82, 85 (Tenn. 2001) (citing ***State v. Shirley***, 6 S.W.3d 243, 247 (Tenn. 1999)).

---

[5] The order of the trial judge states: "The father shall make no further defamatory or derogatory remarks or comments about the Mother under any circumstances, oral or written, or including but not limited to, comments that the Mother is a drug user, prostitute, or has drug affiliations, or anything along those lines."

[6] Father, even though he is representing himself, is required in his appellate brief to cite to specific references from the trial record. Rules of the Ct. of App. of Tenn. 6(b); *see Paehler v. Union Planters Nat'l Bank*, 971 S.W.2d 393, 396 (Tenn. Ct. App. 1997) ("Parties who choose to represent themselves . . . are not excused from complying with applicable substantive and procedural law. . . ."). With a single exception, Father failed to do so here. We nevertheless address the issues raised on appeal.

Father first argues that the trial court erred in setting his child support payment at $2,500 per month. Father asserts that he did not open his own medical practice in an effort to evade responsibility for his obligations, and he maintains that he cannot pay this level of child support. In its written order, the trial court held:

> The Court affirmatively finds that the Father is voluntarily underemployed; that the Father is a neo-natologist and has extensive skills and training and has more training and experience that the Mother; that the Father is capable of earning at least the amount of money earned by the Mother, who is a pediatrician, employed in the public sector, less specialized than Father, and with five minor children living with her at home. The Father's child support obligation is hereby set at $2,500 per month, payable for the use and benefit of the parties' three minor children, which is in accordance with the D.H.S. Guidelines, based on Father's ability to earn. . . .

Thus, the trial court found Father was voluntarily underemployed, found his earning capacity to be at the level of Mother's income, and accordingly, set child support at $2,500 per month.

If the trial court finds that an obligor parent is voluntarily underemployed, it is clearly authorized to determine the obligor parent's earning capacity and set child support based on that level of income. The Rules of Tennessee Department of Human Services Child Support Services Division state: "[i]f an obligor is wilfully and voluntarily unemployed or underemployed, child support shall be calculated based on a determination of potential income, as evidenced by educational level and/or previous work experience." Tenn. Comp. R. and Regs. 1240-2-4-.03(3)(d) (1997); *see also Watters v. Watters*, 22 S.W.3d 817, 820-21 (Tenn. Ct. App. 1999). Based on Father's educational level and prior work experience, the trial court was clearly justified in finding that Father was voluntarily underemployed, and conservative in determining that his potential income was the same as Mother's compensation as a pediatrician. Indeed, Father's real estate, automobiles and other indicia of wealth make his protestations of poverty ring hollow. The trial court was obviously skeptical of Father's assertions that he was unable to afford to pay child support:

> . . . I find it awfully difficult to think that these children deserve less money than the bank for two automobiles. . . . [J]ust to be honest with you, that strikes the court as a little unusual when you can afford $2,000 a month for automobiles for you and your staff, and yet you are complaining about $2,500 a month for three children. . . .

The trial court did not err in declining to permit Father to either choose employment that does not realize his earning potential, or to allow him to direct his income toward real estate and automobiles instead of to the support of his children. The trial court's determination of Father's child support obligation is affirmed.

Father next argues that the trial court erred in assigning the parties' remaining tax debt to him, contending that the assignment of the tax liability is in contravention of the parties' antenuptial agreement. He asserts that he has been required to pay most of the $89,000 tax burden, and

maintains that the antenuptial agreement calls for equitable distribution of the tax debt. While the trial court has wide discretion in distributing marital assets and debts, an antenuptial agreement may be utilized to distribute marital property. *See Perkinson v. Perkinson*, 802 S.W.2d 600, 601 (Tenn. 1990); *see also* Tenn. Code Ann. § 36-3-501.[7] The antenuptial agreement executed by the parties states in part that:

> If, in connection with any joint Federal Income Tax Return heretofore or hereafter filed by the parties, there is a deficiency assessment, the amount ultimately determined to be due thereon shall be borne by the party whose deduction, income or misreporting resulted in the deficiency assessment. If such a determination can not be reasonably made, the parties shall bear the deficiency based upon the pro rata Adjusted Gross Income of the parties for the tax year in question.

The federal tax liability at issue in this case accrued as a result of the parties' 1996 joint tax return. The evidence showed that federal taxes on Mother's income were withheld by her employers; thus indicating that the tax deficiency was for Father's income. The evidence also showed that Mother had contributed over $11,000 into a joint account to assist Father in paying the tax debt. Father testified that he may have put only one or two deposits into the account. Cancelled checks in evidence indicate that Father wrote checks out of the account to the IRS in a total amount of approximately $8,000. Thus, based on the evidence at trial, the trial court's allocation of the tax debt to Father is consistent with the provisions of the prenuptial agreement and is equitable. This decision is affirmed.

Father next argues that the trial court erred in "profoundly limiting visitation" with his children, by granting him alternate-weekend parenting time and other parenting time, provided that he has a suitable place for the children to stay. He argues that this is unacceptable, and indicates that it is contrary to the parties' antenuptial agreement. In determining child custody, the best interest of the children, rather than the parents, is the court's paramount concern. *See* Tenn. Code Ann. § 36-6-101(a)(2) (". . .but the court shall have the widest discretion to order a custody agreement that is in the best interest of the child. . . ."). Even if the prenuptial agreement mandated joint custody, which it does not, this would not affect the trial court's authority, indeed, obligation, to determine

---

[7]Section 36-3-501 of the Tennessee Code Annotated provides:

> Notwithstanding any other provision of law to the contrary, except as provided in § 36-3-502 [regarding creditors' rights], any antenuptial or prenuptial agreement entered into by spouses concerning property owned by either spouse before the marriage which is the subject of such agreement shall be binding upon any court having jurisdiction over such spouses and/or such agreement if such agreement is determined, in the discretion of such court, to have been entered into by such spouses freely, knowledgeably and in good faith and without exertion of duress or undue influence upon either spouse. The terms of such agreement shall be enforceable by all remedies available for enforcement of contract terms.

Tenn. Code Ann. § 36-3-501 (2001).

custody and parenting time in accordance with the best interests of the children. ***See Edwardson v. Edwardson***, 798 S.W.2d 941, 946 (Ky. 1990) (holding that antenuptial agreements are ineffectual in determining child custody and visitation issues, and stating that, "[w]hile it may go without saying . . . [q]uestions of child support, child custody, and child visitation are not subject to [antenuptial agreements].").  In making child custody decisions, "trial courts . . .take into account a number of factors, including the parents' demeanor and credibility during the divorce proceedings themselves. Accordingly, this Court is reluctant to second-guess a trial court's decisions regarding child custody." ***Nelson v. Nelson***, 66 S.W.3d 896, 901 (Tenn. Ct. App. 2001) (quoting ***Gaskill v. Gaskill***, 936 S.W.2d 626, 631 (Tenn. Ct. App. 1996) (internal quotation marks omitted)).

Here the evidence indicated that Father paid child support only when ordered to do so, and was held in contempt for failing to pay in a timely manner.  He had left the children unattended in a park and in his office, and did not have a residence suitable for the children to live with him. Considering all of the evidence, and with appropriate deference to the trial court's assessment of the parties' demeanor and credibility, we cannot conclude that the trial court erred in awarding custody to Mother and in establishing the parameters on Father's parenting time.

Father also argues that the trial court erred in prohibiting him from making derogatory remarks about Mother, characterizing it as a "gag order" in violation of his First Amendment rights. We modify the trial court's order in this regard, limiting it to remarks or comments about Mother to the children or in the presence of the children.  This does not prevent Mother from obtaining any other relief against Father, either civil or criminal, for remarks made to others about Mother outside the presence of the children.  Thus, the order is affirmed as modified.

Mother seeks her attorney's fees for this appeal.  This request is granted, and the case is remanded to the trial court for a determination of Mother's reasonable attorney's fees for this appeal.

The decision of the trial court is affirmed as modified, and the cause is remanded for further proceedings consistent with this Opinion.  Costs are taxed to appellant, Ifeatu Ekelem, and his surety, for which execution may issue, if necessary.

 

 

_____
HOLLY KIRBY LILLARD, JUDGE