RENDERED: DECEMBER 10, 2021; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-1624-MR

LYNDSEY M. KING, CHELSEY
N. KING, BAILEY M. KING,
ANDREW R. KING, AND
ASHLEY D. KING (ADULT CHILDREN
OF RANDALL KING, M.D.)                                    APPELLANTS

APPEAL FROM DAVIESS CIRCUIT COURT
v.           HONORABLE JAY A. WETHINGTON, JUDGE
ACTION NO. 17-CI-00375

KARLA EVELYN
GARDNER KING                                              APPELLEE

AND                     NO. 2020-CA-1627-MR

A.K.K. (MINOR CHILD OF DR.
RANDALL KING, M.D.)                                       APPELLANT

APPEAL FROM DAVIESS CIRCUIT COURT
v.           HONORABLE JAY A. WETHINGTON, JUDGE
ACTION NO. 17-CI-00375

KARLA EVEYLN
GARDNER KING                                                    APPELLEE

<u>OPINION</u>
<u>AFFIRMING</u>

** ** ** ** **

BEFORE:  CLAYTON, CHIEF JUDGE; COMBS AND L. THOMPSON, JUDGES.

CLAYTON, CHIEF JUDGE:  This appeal is taken from a Daviess Circuit Court order and declaratory judgment.  The trial court found that a prenuptial agreement between Karla Evelyn Gardner King ("Karla") and her late husband, Randall E. King, M.D. ("Randall"), is void and invalid for lack of full disclosure of the extent and value of the parties' assets prior to the execution of the agreement.  The appellants, who are the children of Randall King ("the Kings"), argue that the trial court departed from clear precedent in making this determination and improperly admitted and relied upon hearsay of Randall.  In addition, they seek to modify the standard for invalidating such an agreement on the grounds of nondisclosure by requiring an additional finding of deception, fraud, or material omission.  For the following reasons, we affirm.

Karla and Randall met in July 2012.  Both had been married before. Karla, who holds a master's degree in nursing from Vanderbilt University, was living in Tennessee and working as a registered nurse in aesthetics.  Randall was a

physician specializing in obstetrics and gynecology in Owensboro. Karla moved to Randall's home in Owensboro in October 2012 and they were married a short time later on Thanksgiving, November 22, 2012. According to Karla, they planned for Randall to continue his successful medical practice after their marriage and also to act as a consultant to her cosmetic surgery and procedure clinic.

Randall's previous marriage had ended in a contentious manner and Karla testified that Randall first mentioned the topic of a prenuptial agreement to her as something that his family wanted. Randall and Karla then had a lunch meeting with attorney Gary Abshier to discuss the subject. Karla testified she indicated at the meeting she was willing to sign a prenuptial agreement if it was fair to both of them.

On November 14, 2012, shortly before their wedding, Randall and Karla met with Randall's attorney, J.D. Meyer, to prepare for a custody and support hearing involving Randall's youngest child. At the close of the meeting, Randall raised the subject of a prenuptial agreement for the first time with Meyer. Meyer testified that Karla discussed the general terms she would agree to and gave Meyer the contact information for her attorney. Meyer testified he made it clear he could not represent both Randall and Karla in the matter, which was why he took down Karla's attorney information.

On November 19, 2012, Meyer met first with Randall and then with Randall and Karla. According to Meyer, the meeting with Randall lasted approximately 45 minutes to one hour; the meeting at which Karla was present was very brief. No specific terms were discussed with Karla and Meyer reiterated that he wanted to ensure she knew he did not represent her. He did not speak to her again after the November 19 meeting.

On the same day, Meyer sent Randall a first draft of the agreement. His accompanying email stated: "We definitely need the financial disclosures in order to complete the agreement." Meyer also expressed concern about Karla's attitude to the agreement: "It has apparently upset her vastly and I can understand that. But, her comment that she did not want to read it and will just sign anything causes me concern from a legal standpoint. I am fearful she will try to question the enforceability of the agreement in the future." Meyer warned that Karla might try to argue that she was forced to sign the agreement and stressed that her attorney should review the agreement, stating: "Her counsel's signature will provide some legitimacy to the agreement and its enforceability and prevent the argument that the terms are unfair."

He emailed a second draft to Randall on November 21, 2012. This version, which the parties signed the next day, included provisions Karla wanted. In the event of a separation, Randall was required to remain as a collaborating

physician in her clinic for one year. He was also required to pay her the equivalent of her salary for the previous year and double that amount if he were unfaithful. In the event of his death, the agreement provided that Karla would receive $200,000 and her listed separate property.

The agreement also contained a provision stating that the parties each acknowledged they had made a full disclosure of the nature, extent, and value of each party's separate estate and financial condition as of the date of the agreement. It stated that the parties acknowledged they had each been afforded a full and adequate opportunity to verify and to seek and receive independent advice concerning all representations made by the other party and that copies of each party's financial statement had been attached to the agreement as Exhibits "A" and "B" and were incorporated into the agreement by reference. It further stated: "Neither party represents that his or her respective balance sheet is a precise identification of his or her assets and liabilities, but such does constitute a reasonable approximation of such assets and liabilities. Each party represents to the other that he or she has fully disclosed to the other his or her financial situation by representations contained in the balance sheet, subject only to the qualification that the balance sheets were prepared informally and without reference to specific documentation."

Randall never replied to Meyer about the agreement nor did he send him the financial disclosures. Karla did not provide Meyer with any financial disclosures and her attorney never reviewed the agreement. Their balance statements were never attached to the agreement.

Meyer testified that if he had been consulted, he would have added a provision to the agreement that Karla had waived the opportunity to get her own attorney to review the agreement and a provision stating that Meyer did not represent her. He also testified that if they had signed it in his office, he would have added something to the agreement about the absence of financial disclosures from the parties.

On the day of the wedding, which took place at Randall's home, Randall came into the bedroom where Karla was getting ready for the ceremony and gave her the agreement to sign. He had already signed it. According to Karla, he told her she needed to sign the agreement so they could get married, and that the agreement "did not mean anything." Karla's mother, Nancy Gardner, who was also in the bedroom, testified that when Randall came into the room, Karla was in the bathroom finishing up her makeup and hair. Gardner testified: "He called her in there and told her she needed to sign that, and she said, what is it, and he said, it's the prenuptial agreement. And she said, well, Randy, I haven't read it, and he said I haven't either, but you need to sign it, and then he left the room." According

to Gardner, this conversation occurred about ten minutes before the wedding ceremony. According to Karla, it was her understanding that the prenuptial agreement addressed what would happen if she and Randall divorced but she did not know the agreement contained any provisions regarding what would happen if one of them died.

Randall died intestate on October 9, 2016. Karla filed a declaratory judgment action claiming the prenuptial agreement was invalid and unenforceable because it was the product of duress, unconscionability, and overreaching. As additional grounds for invalidating the agreement, she claimed she had not been made aware of the nature, extent, and value of Randall's estate before signing the agreement.

A bench trial was conducted on September 28-30, 2020. Relying on a balance sheet Randall submitted to a bank in early 2013 when he was applying for a loan, the trial court found his net worth at the time of the marriage to Karla to be over $5.2 million. Karla testified about the extent of her knowledge of Randall's estate prior to their marriage. She knew he was a physician with a busy medical practice and that he also worked at a plasma center. She knew he or one of his companies owned his home, his medical office building, and a strip mall which housed numerous stores. She also knew he owned all-terrain vehicles, a Ford F-150, a Cadillac Escalade, and a Lexus. She was not aware of the specific value of

any of these assets, or that Randall had a 401(k) plan, three bank accounts containing over $127,000, and a life insurance policy with a $4 million death benefit.

The trial court found that although Karla had failed to prove her claims of duress, unconscionability, and overreaching, neither of the parties had done what they specifically attested to in the agreement: they had not attached their financial statements, they had not made full disclosures of the extent and values of their estate, and had not attached any definitions of separate property. On the day of their marriage, they told each other they had not read the agreement, even though they attested that they had. The trial court concluded that neither party "manifested faith in the integrity of the agreement or their stated promises to each other" and neither party "manifested the intention to respect the agreement." For these reasons, it declared the agreement to be void.

This appeal by Randall's children followed. Independence Bank of Kentucky, the administrator of Randall's estate, was a defendant in the case below but did not join in the appeal.

In reviewing the trial court's decision, the trial court's findings of fact "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Kentucky Rules of Civil Procedure ("CR") 52.01. A factual finding is not clearly erroneous

if it is supported by substantial evidence, which is defined as evidence which has "sufficient probative value to induce conviction in the mind of a reasonable person." *Gosney v. Glenn*, 163 S.W.3d 894, 898 (Ky. App. 2005). The trial court's conclusions of law, however, are reviewed *de novo*. *Id.*

"As a general rule, antenuptial agreements, if supported by valid consideration, are valid and enforceable and favored in the law." *Luck v. Luck*, 711 S.W.2d 860, 862 (Ky. App. 1986). "The first limitation upon parties to an antenuptial agreement is the requirement of full disclosure." *Edwardson v. Edwardson*, 798 S.W.2d 941, 945 (Ky. 1990). In assessing the validity of an agreement, the court must ask: "[W]as there a full and complete disclosure of the property owned by each party at the time the contract was entered into?" *Luck*, 711 S.W.2d at 862. "The law is clear that the burden of proof regarding the question of full disclosure of assets at the time of the agreement rests on the party relying on the agreement." *Lawson v. Loid*, 896 S.W.2d 1, 2 (Ky. 1995), *as modified on denial of reh'g* (May 11, 1995) (citations omitted).

The Kings argue that the trial court's finding that the parties failed to make full disclosure of the extent and value of their estates was not supported by substantial evidence and departed from clear precedent. They rely upon *Lawson v. Loid*, *supra*, and an unpublished opinion of this Court, *Copley v. Copley*, No. 2009-

CA-001102-MR, 2010 WL 3447703 (Ky. App. Sep. 3, 2010), to support their argument that the facts of this case compelled a different conclusion.

In *Lawson*, the prenuptial agreement at issue provided for the wife to receive $1,000 as settlement of any claims for dower or maintenance. 896 S.W.2d at 2. Both the husband and wife had been married before and the husband had four children from his previous marriage. *Id.* at 1-2. The wife was educated and had been employed as a bookkeeper at the husband's Buick dealership before their marriage. *Id.* at 3. The agreement was executed on the day of their wedding, in 1952. *Id.* at 2. Thirty-seven years later, when the husband passed away, his estate was worth between $2.5 and 4 million. *Id.* The trial court found that the wife was aware of the husband's financial condition at the time of the marriage because of her employment as a bookkeeper at his dealership. *Id.* at 3. It held that the prenuptial agreement was valid, finding "that the estate of the wife had failed to present any competent or relevant testimony proving that the husband had not made a full disclosure concerning his financial condition at the time of the marriage and execution of the agreement." *Id.* at 2. The Court of Appeals reversed on the grounds that the trial court had applied the wrong burden of proof on the question of full disclosure. *Id.* at 1. The Kentucky Supreme Court reversed the Court of Appeals, holding that the burden of proof rested on the party relying on the agreement and that the trial court's findings were supported by substantial

evidence, stating that "[a] review of the evidence clearly shows that the wife was aware of the husband's assets prior to the execution of the agreement." *Id.* at 3. The Supreme Court cited as significant evidence the fact that the wife was an educated woman who had been previously married and divorced, had worked as a bookkeeper at her husband's business, and that the parties had kept separate bank accounts throughout the entire marriage. *Id*.

In *Copley*, the Court of Appeals affirmed the trial court's ruling that a prenuptial agreement was valid and enforceable. *Copley*, 2010 WL 3447703, at *1. As in this case, the schedules which were intended to detail the couple's respective assets were not attached to the agreement. The trial court nonetheless concluded that the wife had knowledge of approximately one-half of the husband's net worth at the time she signed the agreement and that he had not misrepresented the extent and nature of his assets to induce her to sign the agreement. *Id.* at *2. Specifically, the trial court found that at the time of the marriage, the wife knew the husband owned a business, a post office building, a retail store, a car wash, a motor home, his main residence, a smaller residence, and his vehicles. *Id.* She also knew he was on the board of a bank. *Id.* The Court of Appeals affirmed on the grounds that her substantial knowledge of the nature and extent of the husband's assets was sufficient to satisfy the disclosure requirement. *Id.*

The Kings argue that the facts of their case sufficiently resemble those of *Lawson* and *Copley* to mandate a finding of adequate disclosure of Randall's assets. They point to the following similarities amongst the cases: Karla is well-educated; both she and Randall had previously been married; Karla had assisted her former husband, a veterinarian, to build his office and their home; Karla was aware that Randall owned various parcels of real estate; Karla and Randall maintained separate checking accounts during their marriage; and their prenuptial agreement was executed shortly before the marriage. As to the failure to attach the financial disclosures to the agreement, they note there was no attached schedule of assets mentioned in the *Lawson* prenuptial agreement either, whereas the Kings' agreement expressly stated that the parties had knowledge of the extent and nature of each other's assets and liabilities. The Kings also emphasize that, like the wife in *Copley*, Karla received a substantial amount of assets upon Randall's death. In *Copley*, the husband's estate contained assets of $2.9 million; the wife received a $200,000 home, two vehicles, $4,000 in rental income, and $20,000 in cash. *Copley*, 2010 WL 3447703, at *2. Randall's estate contained assets of $5.2 million; Karla received $200,000 under the prenuptial agreement and she received the marital home, which sold for $599,000, through joint tenancy. The Kings claim that the very same evidence that induced the *Copley* and *Lawson* Courts to find full disclosure was ignored by the trial court here.

*Lawson* and *Copley* do not stand for the proposition that factual similarities mandate a particular legal result. The facts set forth in *Lawson* and *Copley* are not intended as a rigid checklist to govern future cases. Our standard of review requires us to exercise deference towards the findings of the trial court and to review every agreement on a case-by-case basis. *Lane v. Lane*, 202 S.W.3d 577, 579 (Ky. 2006). Our standard remains whether the trial court's findings were supported by substantial evidence. As earlier noted, *Lawson* clearly holds that the party seeking to uphold the agreement bears the burden of proving full disclosure of assets at the time the agreement was executed. *Lawson*, 896 S.W.2d at 2. The trial court found as credible Karla's testimony that she was unaware of the character and full extent of Randall's financial holdings, comprising the real property, the bank and retirement accounts, and the $4 million life insurance policy. It is undisputed that neither Randall nor Karla provided the financial disclosures specified by the agreement and there is substantial evidence in the form of their own statements and the statements of Randall's attorney to support the trial court's conclusion that neither party took the agreement seriously.

Next, the Kings argue that the trial court abused its discretion and committed reversible error by admitting and relying upon hearsay testimony from Randall. The appellees made a motion *in limine* to exclude the statements Randall made to Karla in the bedroom immediately prior to the wedding, in which he told

-13-

her to sign the agreement or they would not get married, that it didn't mean anything, and that his family wanted him to do it. The trial court ruled that the statements were admissible as a declaration against interest, and it relied on the statements in its final ruling as evidence that Randall had actually not read the agreement and that he signed it to satisfy his family's wishes. The court also wrote that "[n]either party, on the day they presented the agreement to each other, manifested faith in the integrity of the agreement or their stated promises to each other."

"Hearsay is inadmissible unless it is excepted under the Kentucky Rules of Evidence [("KRE")]. The rules contain an exception for statements made against the declarant's interest under KRE 804(b)(3). The exception applies where the declarant is unavailable to testify at trial[.]" *Fisher v. Commonwealth*, 620 S.W.3d 1, 11 (Ky. 2021) (footnote omitted). A statement against interest is defined as follows:

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

KRE 804(b)(3).

At the time Randall made the statements to Karla, they were against his pecuniary interest because they could be used to invalidate the prenuptial agreement which, in the event of a divorce, would have operated in his favor. Thus, his statements were admissible under KRE 804(b)(3).

Finally, the Kings argue that a prenuptial agreement should not be invalidated for inadequate disclosure unless there is also evidence of deception, fraud, or material omission. We do not have the authority to add additional requirements to the legal standard established by our state's highest Court:

> The abstract declaration of the law that an antenuptial contract must have been fairly entered into usually consists in requiring that it be shown that the agreement substituting contractual rights for statutory rights was equitable and just, made freely and with a knowledge of the prospective wife or husband of the nature and extent of the other's estate and of her or his property rights which would otherwise be acquired by reason of the marriage.

*Truitt v. Truitt's Adm'r*, 290 Ky. 632, 636, 162 S.W.2d 31, 33-34 (1942); *see also Edwardson*, *supra*.

"[A]s an intermediate appellate court, this Court is bound by established precedents of the Kentucky Supreme Court. SCR [Kentucky Supreme Court Rules] 1.030(8)(a). The Court of Appeals cannot overrule the established precedent set by the Supreme Court or its predecessor Court." *Smith v. Vilvarajah*, 57 S.W.3d 839, 841 (Ky. App. 2000).

For the foregoing reasons, the order and judgment of the Daviess

Circuit Court is affirmed.

ALL CONCUR.


JOINT BRIEF FOR APPELLANTS:      BRIEF FOR APPELLEE:

Travis L. Holtrey                R. Michael Sullivan
Tyler H. Johnson                 L. Christopher Hunt
Jennifer L. Hendricks            Owensboro, Kentucky
Owensboro, Kentucky