S07F1817. BLIGE v. BLIGE.
(656 SE2d 822)

SEARS, Chief Justice.

Meagan Taylor Blige filed a complaint for divorce against Willie Alonzo Blige in 2005. The trial court set aside the parties' antenuptial agreement based on Mr. Blige's failure to make a fair and complete disclosure of his assets, income, and liabilities, and the jury returned a verdict awarding Ms. Blige $160,000 representing her equitable interest in the marital home. Mr. Blige filed an application for discretionary review, which this Court granted pursuant to its pilot project in family law cases. We have determined that the trial court did not err in setting aside the antenuptial agreement for non-disclosure and that the jury did not err in awarding Ms. Blige $160,000 as her equitable interest in the marital property. Accordingly, we affirm.

1. The Bliges had a child together in 1994 and married in 2000. They did not live together before the marriage. The day before the wedding, Mr. Blige took his bride-to-be to an office building to meet with an attorney he had hired for her. The attorney handed her a fully drafted antenuptial agreement, read through it with her, and asked her to sign it, which she did. Mr. Blige signed the antenuptial agreement later, and the parties were married the following day as scheduled.

The antenuptial agreement provided that Mr. Blige would retain as his sole and separate property 19.5 acres of land in Bryan County that he had previously purchased "together with any house or structure which may be situated upon said property." There was no house or structure situated on the property when the parties married, but Mr. Blige had hidden away $150,000 in cash that he planned to use to build a home there after the wedding. Ms. Blige knew Mr. Blige worked as a delivery truck driver and approximately what he made. However, Mr. Blige never told Ms. Blige about the $150,000 in cash, and she had no knowledge of the money from any other source.

On July 26, 2005, Ms. Blige filed a complaint for divorce in the Bryan County Superior Court. In his answer and counterclaim, Mr. Blige sought enforcement of the antenuptial agreement. Ms. Blige moved to have it set aside for failure to comply with the legal requirements for antenuptial agreements, and the trial court conducted a pretrial evidentiary hearing on the issue. After hearing from both Mr. Blige and Ms. Blige, the trial court found as fact that Mr. Blige failed to make a fair and clear disclosure of his income, assets, and liabilities to Ms. Blige before the execution of the antenuptial agreement. On November 7, 2006, the trial court entered an order setting aside the antenuptial agreement, and a jury trial on property division ensued.

The evidence before the jury showed that Mr. Blige put the $150,000 in cash he had concealed from Ms. Blige toward the construction of an enormous home on the Bryan County property. The cost to complete the construction of the home was approximately $280,000, and by the time of trial, it was worth approximately $375,000 to $400,000. At the conclusion of the evidence, the jury returned a verdict awarding Mr. Blige the Bryan County property and house minus $160,000 to be paid to Ms. Blige representing her equitable interest in the marital property. The jury assigned each party the debts held in his or her own name and held that Mr. Blige would be responsible for the mortgage on the house. On February 15, 2007, the trial court entered a final judgment and decree of divorce incorporating the jury's equitable division of the marital property. Mr. Blige appealed.

2. Until 1982, antenuptial agreements were unenforceable in Georgia divorce proceedings as being contrary to public policy.[1] Then, in *Scherer v. Scherer*, this Court concluded that Georgia courts were

---

[1] *Scherer v. Scherer*, 249 Ga. 635, 638 (292 SE2d 662) (1982).

no longer justified in applying a rule of per se invalidity to antenuptial agreements entered into in contemplation of divorce.[2] At the same time, we recognized the importance of marriage as a social institution and the vital public policy interests that can be undermined by antenuptial agreements.[3] Accordingly, we held that antenuptial agreements would henceforth be enforceable in Georgia divorce proceedings, but only if certain prerequisites are met.

Taking the law of other jurisdictions as our guide, we devised a three-part test for determining whether a particular antenuptial agreement is enforceable under Georgia law. We held that the party seeking enforcement bears the burden of proof to demonstrate that: (1) the antenuptial agreement was not the result of fraud, duress, mistake, misrepresentation, or nondisclosure of material facts; (2) the agreement is not unconscionable; and (3) taking into account all relevant facts and circumstances, including changes beyond the parties' contemplation when the agreement was executed, enforcement of the antenuptial agreement would be neither unfair nor unreasonable.[4] The *Scherer* test, as refined and clarified by our later case law, continues to govern the enforceability of antenuptial agreements.[5]

The three-part test we adopted in *Scherer* is consistent with the standards governing the enforcement of antenuptial agreements that prevail throughout most of the nation today. As one commentator has explained:

> Generally accepted guidelines for analyzing antenuptial agreements determine whether they are enforceable. The contract must meet the usual requirements of offer, acceptance, and consideration, and there is often an implied, sometimes express, requirement of fundamental fairness.

---

[2] *Scherer v. Scherer*, 249 Ga. at 640 (overruling *Reynolds v. Reynolds*, 217 Ga. 234, 234 (123 SE2d 115) (1961)).

[3] See *Langley v. Langley*, 279 Ga. 374, 376 (613 SE2d 614) (2005) ("The enforceability of antenuptial agreements is, of course, a matter of public policy."). See also *In re Marriage of Bonds*, 5 P3d 815, 830 (Cal. 2000) ("[M]arriage itself is a highly regulated institution of undisputed social value, and there are many limitations on the ability of persons to contract with respect to it, or to vary its statutory terms. . . .").

[4] See *Scherer v. Scherer*, 249 Ga. at 640 (citing *Posner v. Posner*, 257 S2d 530 (Fla. 1972); *Posner v. Posner*, 233 S2d 381 (Fla. 1970); *Volid v. Volid*, 286 NE2d 42 (Ill. App. Ct. 1972); *Tomlinson v. Tomlinson*, 352 NE2d 785 (Ind. Ct. App. 1976); *Buettner v. Buettner*, 505 P2d 600 (Nev. 1973); *Hudson v. Hudson*, 350 P2d 596 (Okla. 1960)). Compare 24 AmJur2d Divorce and Separation § 18; Unif. Premarital Agreement Act § 6, 9B U.L.A. 369, 376 (1987).

[5] See *Chubbuck v. Lake*, 281 Ga. 218, 219 (635 SE2d 764) (2006) ("We have been unable to find a case in which an antenuptial agreement made in contemplation of divorce has been ruled void and unenforceable for a reason other than failure to live up to the criteria set out by this Court in *Scherer v. Scherer*, [cit.].").

The agreement cannot violate a statute or clear public policy. If the circumstances have changed beyond the parties' contemplation at the time they entered into the agreement, it may not be enforceable. Usually both parties must fully disclose their assets at the time of the agreement. . . .[6]

We evaluate a trial court's determination regarding the enforceability of an antenuptial agreement under the familiar abuse of discretion standard of review.[7]

On appeal, Mr. Blige contends the trial court erred in setting aside the antenuptial agreement under the first prong of the *Scherer* test, i.e., the agreement must not be the result of fraud, duress, mistake, misrepresentation, or nondisclosure of material facts. To satisfy the first prong of the *Scherer* test, the party seeking enforcement must show both that there was "a full and fair disclosure of the assets of the parties prior to the execution of the [antenuptial] agreement," and that the party opposing enforcement entered into the antenuptial agreement "[freely], voluntarily, and with full understanding of its terms after being offered the opportunity to consult with independent counsel."[8] Thus, Georgia law, like that of virtually every other State in the Union, imposes an affirmative duty of disclosure on both parties to an antenuptial agreement.[9] In essence, the law writes into every antenuptial agreement a provision requiring both parties to disclose all material facts.[10] Absent "full and fair

---

[6] Howard O. Hunter, Modern Law of Contracts, § 24:13 (3d ed. rev. 2007) (footnotes omitted).

[7] *Alexander v. Alexander*, 279 Ga. 116, 117 (610 SE2d 48) (2005); *Adams v. Adams*, 278 Ga. 521, 522 (603 SE2d 273) (2004).

[8] *Adams v. Adams*, 278 Ga. at 522. See Judith T. Younger, *Perspectives on Antenuptial Agreements: An Update*, 8 J. Am. Acad. Matrim. Law. 1, 24 (1992) ("The requirement of financial disclosure is closely related to that of voluntariness and follows from the nature of antenuptial agreements themselves. They call for waivers of, or alterations in, marital property rights prescribed by the state. Marital property rights take on, or lose, value on the bases of spouses' earning power and assets. A waiver of, or alteration in, such rights can hardly be voluntary, and therefore fair, if the waiving spouse does not know the other's financial status.").

[9] See *Corbett v. Corbett*, 280 Ga. 369, 370 (628 SE2d 585) (2006) (upholding trial court's refusal to enforce antenuptial agreement based on finding that husband "failed to disclose his income" because "[h]usband's income . . . was material to the antenuptial agreement"); *Alexander v. Alexander*, 279 Ga. at 118 ("The question before the [trial] court was whether there was a . . . nondisclosure of a material fact."); 5 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 11:8 (4th ed. 2003) (Williston on Contracts) (collecting cases); Younger, supra at 24 ("[M]ost jurisdictions require some kind of financial disclosure before the contract is signed.") (footnotes omitted).

[10] See *Sikora v. Vanderploeg*, 212 SW3d 277, 280 (Tenn. Ct. App. 2006). See also 5 Williston on Contracts § 11:8 ("[M]odern statutory and case law holds that in order for a premarital agreement to be enforceable, the parties must fairly disclose their respective financial status, and other material information. . . .").

disclosure" of the parties' financial condition prior to execution, enforcement of the antenuptial agreement would violate Georgia public policy.

The trial court specifically found that Mr. Blige did not make a "fair and clear disclosure of his income, assets and liabilities before the parties signed [the] antenuptial agreement" as required by the first prong of the *Scherer* test. The evidence presented at the pretrial hearing showed that at the time of the parties' marriage, Mr. Blige made his living as a vending and delivery person for Savannah Coca-Cola. His base pay was $10 an hour. A year before the nuptials, Mr. Blige purchased 19.5 acres of land in rural Bryan County for $85,000. He owned no other property. Ms. Blige did not live with Mr. Blige before the marriage, and it was undisputed that he never told her prior to the execution of the antenuptial agreement that he had $150,000 in cash in his possession. To the contrary, there are indications in the record that Mr. Blige actively hid his true financial status from Ms. Blige before the marriage and for some time thereafter. Thus, the evidence in the record amply supports the trial court's finding that Mr. Blige failed to disclose a fact material to the antenuptial agreement — i.e., the $150,000 in cash he had hidden away — and therefore did not make a full and fair disclosure of his financial status before the signing of the antenuptial agreement as required by the first prong of the *Scherer* test.

Mr. Blige claims that in spite of his nondisclosure of the $150,000 in cash, the trial court was required to enforce the antenuptial agreement under our recent decision in *Mallen v. Mallen*.[11] However, *Mallen* is easily distinguishable on the facts, at least with respect to the disclosure requirement. First, in *Mallen*, the trial court, after hearing all the evidence, exercised its discretion to uphold the antenuptial agreement, while here, the trial court exercised its discretion to do the opposite. Second, in *Mallen*, the parties attached financial disclosure statements to the antenuptial agreement itself that accurately reflected their assets and liabilities and that clearly revealed the tremendous disparity between the net worths of the prospective spouses (approximately $10,000 versus at least $8.5 million); there was no exchange of financial disclosure statements between the Bliges.[12] Third, the Mallens had lived together for four years before

---

[11] *Mallen v. Mallen*, 280 Ga. 43 (622 SE2d 812) (2005).

[12] We agree with the courts of most other states that "[t]hough not required, a fairly simple and effective method of proving disclosure is to attach a net worth schedule of assets, liabilities, and income to the [antenuptial] agreement itself." *Randolph v. Randolph*, 937 SW2d 815, 821 (Tenn. 1996). Accord *Friezo v. Friezo*, 914 A2d 533, 550 (Conn. 2007) ("We agree with the majority of jurisdictions that a fair and reasonable financial disclosure requires each contracting party to provide the other with a general approximation of their income, assets and

the execution of the antenuptial agreement, and we specifically held that Ms. Mallen "was aware from the standard of living they enjoyed that he [i.e., Mr. Mallen] received significant income from his business and other sources."[13] By contrast, Ms. Blige never moved in with Mr. Blige, even after the marriage, and there was nothing in Mr. Blige's lifestyle to indicate that he might have enormous sums of cash stashed away somewhere.[14]

Mr. Blige argues that *Mallen* requires trial courts to enforce an antenuptial agreement, even where the spouse seeking enforcement did not make a full and fair disclosure, if the spouse resisting enforcement failed to "exercise reasonable diligence in ascertaining the assets" of the other before the execution of the antenuptial agreement. Thus, according to Mr. Blige, *Mallen* recognized a generalized "duty to . . . inquir[e]" into the financial status of one's prospective spouse, and absent such inquiry, a challenge to the enforceability of the antenuptial agreement is barred.

Mr. Blige's reading of *Mallen* turns *Scherer*'s disclosure requirement on its head. *Mallen* did not purport to overrule the portion of the first prong of the *Scherer* test that asks whether the antenuptial agreement was "obtained through . . . nondisclosure of material facts."[15] In *Mallen* itself, both the majority and dissenting opinions directly quoted this portion of the decision in *Scherer*.[16] In decisions rendered both before and after *Mallen*, we have repeatedly recognized that *Scherer* imposes an affirmative duty of full and fair disclosure of all material facts on parties entering into an antenuptial agreement.[17] As noted above, this is the prevailing rule throughout the United States.

To support his claim that *Mallen* created a "duty of inquiry," Mr. Blige relies on a single passage from *Mallen* quoting a New Jersey trial court's description in dicta of what California law regarding the

---

liabilities, and that a written schedule appended to the agreement itself, although not absolutely necessary, is the most effective method of satisfying the statutory [disclosure] obligation in most circumstances.").

[13] *Mallen v. Mallen*, 280 Ga. at 47.

[14] See *Corbett v. Corbett*, 280 Ga. at 370 (holding trial court did not abuse its discretion in declaring antenuptial agreement unenforceable where husband failed to disclose his income, wife waived right to alimony, and nothing in parties' pre-marriage standard of living would have put wife on notice that husband failed to disclose material fact so as to render the nondisclosure immaterial).

[15] *Scherer v. Scherer*, 249 Ga. at 641.

[16] *Mallen v. Mallen*, 280 Ga. at 44 (majority opinion), 49 (Sears, C. J., dissenting).

[17] *Corbett v. Corbett*, 280 Ga. at 370; *Alexander v. Alexander*, 279 Ga. at 117-118; *Adams v. Adams*, 278 Ga. at 522. See also *Allen v. Allen*, 260 Ga. 777, 778 (400 SE2d 15) (1991); *Curry v. Curry*, 260 Ga. 302, 303 (392 SE2d 879) (1990).

enforceability of antenuptial agreements "appear[ed]" to be in 1986.[18] It is worth noting that the *DeLorean* case has never once been relied on or even cited by any California appellate court in construing California law regarding the enforcement of antenuptial agreements. Moreover, while California, like Georgia, does not consider individuals planning to wed to be in a "fiduciary" or "confidential" relationship, California law nevertheless imposes an affirmative duty of disclosure as part of its test for determining the enforceability of antenuptial agreements.[19]

While the *DeLorean* court's interpretation of California law was off the mark, we agree with that court's statement — which it recognized to be the law of New Jersey — that the "better rule" is that the "burden is not on either party to inquire, but on each to inform, for it is only by requiring full disclosure of the amount, character, and value of the parties' respective assets that courts can ensure intelligent waiver of the statutory (and other) rights involved," and that "[w]hen a spouse has a duty to fully and completely disclose his financial wealth[,] we would eviscerate and render meaningless that duty if we imposed upon the other spouse a duty to investigate."[20] In short, the "duty of inquiry" envisioned by Mr. Blige is incompatible with the duty of full and fair disclosure recognized by *Scherer* and its progeny.

Finally, in *Mallen*, we did not rest our decision upholding the trial court's enforcement of the antenuptial agreement on Ms. Mallen's failure to inquire into Mr. Mallen's financial status prior to the execution of the antenuptial agreement. Instead, we concluded that the omission of Mr. Mallen's income from the financial statement he attached to the antenuptial agreement was not material given the unique circumstances of that case. We emphasized the fact that Ms. Mallen had lived with Mr. Mallen for four years before she signed the antenuptial agreement, that the financial disclosure statement Mr. Mallen attached to the antenuptial agreement revealed him to be a wealthy man with significant income-producing assets, and that Ms. Mallen was well aware from the standard of living they enjoyed prior to the marriage that Mr. Mallen received substantial income from the business bearing his name and other sources.[21]

The evidence supports the trial court's finding that Mr. Blige failed to make a full and fair disclosure of his assets, income, and

---

[18] *Mallen v. Mallen*, 280 Ga. at 46 (quoting *DeLorean v. DeLorean*, 511 A2d 1257, 1257 (N.J. Super. Ct. 1986)).

[19] *In re Marriage of Bonds*, 5 P3d at 822-825, 837.

[20] *DeLorean v. DeLorean*, 511 A2d at 1261.

[21] *Mallen v. Mallen*, 280 Ga. at 47. Of course, *Mallen* did not hold that cohabitation before marriage always, or even usually, renders nondisclosure of a party's income "immaterial" as a

liabilities to Ms. Blige prior to the execution of the antenuptial agreement, and nothing in *Mallen* or Ms. Blige's actions or inactions prior to the execution of the antenuptial agreement excuses Mr. Blige's nondisclosure. Accordingly, the trial court properly held that Mr. Blige failed to establish the first prong of the *Scherer* test, and it did not abuse its discretion in setting aside the antenuptial agreement.

3. Mr. Blige also contends the evidence presented at trial does not support the jury's verdict awarding Ms. Blige $160,000 for her equitable interest in the marital property. We have independently reviewed the record on appeal, and it supports the jury's verdict. This argument is meritless.

*Judgment affirmed. All the Justices concur.*

DECIDED JANUARY 28, 2008.

*Murray & Harvey, John D. Harvey*, for appellant.
*McCorkle, Pedigo & Johnson, Kenneth P. Johnson*, for appellee.

---

matter of law for purposes of the first prong of the *Scherer* test. See, e.g., *Randolph v. Randolph*, 937 SW2d at 822-823. To the contrary, the majority opinion emphasized the unusual facts of the case.