S09A1370. LAWRENCE v. LAWRENCE.
(687 SE2d 421)

NAHMIAS, Justice.

This appeal involves the validity and enforceability of an antenuptial agreement.[1] The wife challenged the agreement on two grounds: (1) OCGA § 19-3-63 renders the antenuptial agreement void as a "marriage contract . . . made in contemplation of marriage" not attested by at least two witnesses; and (2) the antenuptial agreement is unenforceable due to insufficient financial disclosure before it was executed. The trial court upheld the agreement. We affirm.

1. Enforcement of an antenuptial agreement is a matter of public policy. See *Langley v. Langley*, 279 Ga. 374, 376 (613 SE2d 614) (2005). In deciding whether to enforce an antenuptial agreement, the trial court "has discretion to 'approve the agreement in whole or in part, or refuse to approve it as a whole.' " *Alexander v. Alexander*, 279 Ga. 116, 117-118 (610 SE2d 48) (2005) (quoting *Allen v. Allen*,

---

[1] Contracts between prospective spouses conditioned on the later occurrence of a marriage are variously referred to in statutes, case law, and treatises as "antenuptial," "prenuptial," "antemarital," or "premarital" contracts or agreements. See 5 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 11:8 (4th ed. 2003) (Williston on Contracts). The difference in terminology has no legal significance under Georgia law. Throughout this opinion, we will refer to the contract at issue as an "antenuptial" agreement.

260 Ga. 777, 778 (400 SE2d 15) (1991)). Accordingly, we evaluate a trial court's ruling regarding the enforceability of an antenuptial agreement under the familiar abuse of discretion standard of review. *Blige v. Blige*, 283 Ga. 65, 68 (656 SE2d 822) (2008). Under this standard, we review the trial court's legal holdings de novo, and we uphold the trial court's factual findings as long as they are not clearly erroneous, which means there is some evidence in the record to support them. See *Langley*, 279 Ga. at 377; *Alexander Properties Group v. Doe*, 280 Ga. 306, 308 (626 SE2d 497) (2006); *Williams v. State*, 277 Ga. 598, 601 (592 SE2d 848) (2004).

2. The evidence in the record, construed to support the trial court's ruling, showed as follows. G. Lawson Lawrence and Angela M. Lawrence began dating in July 2001. Mr. Lawrence owned the building where Ms. Lawrence worked. Ms. Lawrence was an office worker at the time. After a year and half of dating, the couple moved in together, and they were married two years later. Mr. Lawrence, a two-time divorcé, was concerned about the financial impact of a third divorce. Thus, throughout the couple's four-year-long courtship, whenever the topic of marriage came up, Mr. Lawrence would raise the issue of entering into an antenuptial agreement. On February 27, 2005, a little over a month before the wedding, the couple executed an antenuptial agreement.

The agreement was drafted by G. Randall Veal, Mr. Lawrence's attorney. The couple went to Mr. Veal's office together on two occasions to discuss entering into an antenuptial agreement. They informed Mr. Veal that they had been living together for some time, that they wished to marry, and that they both wanted an antenuptial agreement. They both told Mr. Veal that they were each aware of the other's financial position and income, a representation Mr. Veal included in the agreement. At both meetings, Mr. Veal went over the terms of the antenuptial agreement and explained the consequences of signing it for each of them.

Mr. Veal informed Ms. Lawrence that she had the right to have her own attorney look over the agreement and advise her as to its legal consequences. At the second meeting, Ms. Lawrence and Mr. Lawrence agreed that Mr. Lawrence would pick up the finalized agreement from Mr. Veal's office and give her a copy to review with her own attorney if she so desired. However, it was actually Ms. Lawrence who retrieved the finalized agreement from Mr. Veal's office. Ms. Lawrence did not, however, elect to review the antenuptial agreement with another attorney before signing it.

The wedding took place as planned on April 5, 2005. The parties separated three years later. On May 22, 2008, Mr. Lawrence filed a complaint for divorce in the Baldwin County Superior Court, with a copy of the antenuptial agreement attached. Ms. Lawrence filed an

answer and counterclaim alleging that the agreement was unenforceable. Discovery followed, including depositions of Mr. Lawrence and Ms. Lawrence. Mr. Lawrence filed a motion to enforce the antenuptial agreement, and both parties filed briefs addressing the relevant issues.

Ms. Lawrence took the position that the antenuptial agreement was void under OCGA § 19-3-63 because it was not attested by at least two witnesses as required for every "marriage contract . . . made in contemplation of marriage." Alternatively, Ms. Lawrence argued that even if the agreement was not void, it was nevertheless unenforceable, because, despite the agreement's recitation to the contrary, there was no disclosure to her of Mr. Lawrence's income or property prior to the execution of the agreement. The trial court entered an order on January 16, 2009, ruling that the antenuptial agreement was both valid and enforceable. The court then issued a certificate of immediate review, and we granted the wife's application for interlocutory appeal. See OCGA § 5-6-34 (b); Rules of the Supreme Court of Georgia, Rules 30-32.

3. OCGA § 19-3-63 provides that "[e]very marriage contract in writing, made in contemplation of marriage, . . . must be attested by at least two witnesses." Ms. Lawrence correctly notes that the antenuptial agreement was attested by only one witness and claims that it is therefore void. This Court has repeatedly recognized that an antenuptial agreement that purports to settle alimony issues is classified under Georgia law as a contract "made in contemplation of divorce," not a contract "made in contemplation of marriage." *Dove v. Dove*, 285 Ga. 647, 647 (680 SE2d 839) (2009) (collecting cases). The distinction may seem somewhat semantic, but it is well established in the law of Georgia and the rest of the nation. As a leading treatise on the law of contracts explains:

> Historically, the validity of premarital agreements often depended upon whether they were to be effective only upon death or also upon divorce, perhaps most courts taking the view that an antenuptial agreement which *contemplated* and made provision for divorce thereby violated public policy, while one which only encompassed provision for property interests during marriage or upon death did not.

5 Williston on Contracts § 11:8 (emphasis in original). While all states now hold that agreements in contemplation of divorce do not necessarily violate public policy, the distinction between agreements in contemplation of divorce and agreements in contemplation of marriage or death has continued.

The antenuptial agreement in this case addresses alimony.

Moreover, it refers explicitly to the possibility of divorce, explaining that the parties want the agreement to govern in that event:

> While the parties hereto contemplate a lasting marriage, terminated only by the death of one of the parties hereto, they also recognize the unfortunate possibility that their marriage might be terminated by way of divorce or other dissolution during the lifetime of both parties as both parties hereto have had previous divorces from other spouses, and both parties hereto recognize and readily accept the potential frailty of their relationship. In the event of such a dissolution or termination of their marriage during the lifetime of both parties by way of divorce or other dissolution, . . . the parties hereby specifically agree as follows: . . .

Consequently, the antenuptial agreement at issue is clearly a contract made in contemplation of divorce, not a contract made in contemplation of marriage. As such, it is not subject to the dual attestation requirement of OCGA § 19-3-63. See *Dove*, 285 Ga. at 651. Accordingly, the trial court did not err in upholding the validity of the antenuptial agreement against the challenge under OCGA § 19-3-63.

4. Ms. Lawrence further argues that even if the antenuptial agreement is not void, it is still unenforceable as against public policy under the criteria set forth in *Scherer v. Scherer*, 249 Ga. 635 (292 SE2d 662) (1982). Under the three-part test for an enforceable antenuptial agreement set forth in *Scherer* and reiterated by this Court many times since,

> the party seeking enforcement bears the burden of proof to demonstrate that: (1) the antenuptial agreement was not the result of fraud, duress, mistake, misrepresentation, or nondisclosure of material facts; (2) the agreement is not unconscionable; and (3) taking into account all relevant facts and circumstances, including changes beyond the parties' contemplation when the agreement was executed, enforcement of the antenuptial agreement would be neither unfair nor unreasonable.

*Blige*, 283 Ga. at 67. Ms. Lawrence contends that the antenuptial agreement is unenforceable because Mr. Lawrence failed to carry his burden of proof with respect to the first prong of the *Scherer* test. Specifically, she argues that there was insufficient pre-execution

disclosure of Mr. Lawrence's financial status.[2]

To satisfy the first prong of the *Scherer* test, the party seeking enforcement must show both that there was "a full and fair disclosure of the assets of the parties prior to the execution of the [antenuptial] agreement," and that the party opposing enforcement "entered into the agreement [freely], voluntarily, and with full understanding of its terms after being offered the opportunity to consult with independent counsel." *Adams v. Adams*, 278 Ga. 521, 522 (603 SE2d 273) (2004). Georgia law, like that of virtually every other state, imposes an affirmative duty of pre-execution disclosure on parties to an antenuptial agreement. *Blige*, 283 Ga. at 68.[3] Mutual disclosure of the material facts is a precondition for entering into an antenuptial agreement that accords with Georgia public policy. Id.

It is undisputed that, despite what the antenuptial agreement recites, Ms. Lawrence never saw a financial statement or other formal documentation of Mr. Lawrence's financial condition before signing the agreement. As we have said before,

> [w]e agree with the courts of most other states that though not required, a fairly simple and effective method of proving disclosure is to attach a net worth schedule of assets, liabilities, and income to the antenuptial agreement itself.

*Blige*, 283 Ga. at 69, n. 12 (quoting *Randolph v. Randolph*, 937 SW2d 815, 821 (Tenn. 1996)) (punctuation omitted). We reiterate that attaching to the antenuptial agreement financial statements showing both parties' assets, liabilities, and income, while not necessary, "is the most effective method of satisfying the statutory [disclosure] obligation in most circumstances," *Blige*, 283 Ga. at 69, n. 12 (quoting *Friezo v. Friezo*, 914 A2d 533, 550 (Conn. 2007)) (punctuation omitted), thereby deterring protracted and expensive litigation if the antenuptial agreement is later invoked.

Nevertheless, as explained above, we review a trial court's acceptance or rejection of an antenuptial agreement, in whole or in part, for abuse of discretion only, and the record in this case supports

---

[2] Ms. Lawrence does not dispute the trial court's findings on the remaining aspects of the first prong, nor does she contest the court's determination that Mr. Lawrence met his burden of proof with respect to the second and third prongs of the *Scherer* test.

[3] See *Corbett v. Corbett*, 280 Ga. 369, 370 (628 SE2d 585) (2006) (upholding trial court's refusal to enforce antenuptial agreement based on finding that husband "failed to disclose his income" because "[h]usband's income . . . was material to the antenuptial agreement"); *Alexander*, 279 Ga. at 118 ("The question before the court was whether there was a . . . nondisclosure of a material fact."); 5 Williston on Contracts § 11:8 (noting that "modern statutory and case law holds that in order for a premarital agreement to be enforceable, the parties must fairly disclose their respective financial status, and other material information," and collecting cases).

the trial court's determination that there was adequate pre-execution disclosure of Mr. Lawrence's financial status. The record shows that the parties dated for a year and half and then lived together for over two years before they wed. Mr. Lawrence owned Columbia Professional Center, Griffon Pipe, North Rim Office Park, and Lawrence Interiors, all of which Ms. Lawrence knew when she signed the antenuptial agreement. In fact, they met because Ms. Lawrence worked in a building Mr. Lawrence owned. Ms. Lawrence knew that Mr. Lawrence had a successful real estate practice. She knew about roughly 95% of the land Mr. Lawrence owned when she signed the antenuptial agreement, and throughout their courtship, he told her about each project he was involved in, every real estate purchase he made, and even the amounts he borrowed in connection with each purchase.

While they were dating, Mr. Lawrence wined and dined Ms. Lawrence at the country club in Milledgeville where he was a member. Ms. Lawrence knew that Mr. Lawrence owned the approximately 6,000 square foot house where the couple lived after they moved in together, as well as a condominium in Florida, a cabin in Wilkerson County, an Expedition, and a truck. Mr. Lawrence took Ms. Lawrence on numerous trips, including a visit to Jekyll Island to stay on his 38-foot Bayliner boat. Ms. Lawrence knew the couple planned to honeymoon in Hawaii, that Mr. Lawrence had gone hunting in Mexico several times, and that he traveled to Australia with his son. Mr. Lawrence paid off $2,000 in credit card debt for Ms. Lawrence, let her use his credit card to go shopping for herself and her daughter, and gave her a $25,000 Mercedes, a diamond necklace, a pair of emerald earrings, and a total of about $5,000 in cash over the four-year period leading up to the wedding.

In light of the extensive evidence in the record showing Ms. Lawrence's familiarity with Mr. Lawrence's business dealings and personal financial condition, garnered over the course of a lengthy premarital relationship including over two years of cohabitation, and the absence of evidence that Mr. Lawrence had any material income or assets of which Ms. Lawrence was unaware, we cannot say that the trial court abused its discretion in concluding that there was full and fair disclosure of Mr. Lawrence's financial condition prior to the execution of the antenuptial agreement. See *Mallen v. Mallen*, 280 Ga. 43, 47 (622 SE2d 812) (2005) (no abuse of discretion in finding adequate disclosure where parties cohabited for four years, husband's financial statement attached to agreement revealed him to be wealthy man with significant income-producing assets, and wife was well aware from standard of living they enjoyed prior to marriage that husband received substantial income from business bearing his name and other sources). Compare *Blige*, 283 Ga. at 66 (no abuse of

discretion in finding inadequate disclosure where couple did not cohabit before marriage and husband concealed substantial wealth by living modest lifestyle); *Alexander*, 279 Ga. at 117-118 (no abuse of discretion in finding inadequate disclosure where husband, who owned house and $40,000 investment account, failed to disclose the investment account prior to execution of antenuptial agreement). Accordingly, the trial court did not abuse its discretion in ruling that the antenuptial agreement is enforceable.

*Judgment affirmed. Carley, P. J., Benham, Hines and Melton, JJ., concur. Hunstein, C. J., and Chief Judge Amanda F. Williams dissent. Thompson, J., not participating.*

HUNSTEIN, Chief Justice, dissenting.

"[W]e have repeatedly recognized that *Scherer* [*v. Scherer*, 249 Ga. 635 (292 SE2d 662) (1982)] imposes an affirmative duty of full and fair disclosure of all material facts on parties entering into an antenuptial agreement." (Footnote omitted.) *Blige v. Blige*, 283 Ga. 65, 70 (656 SE2d 822) (2008). Because I disagree with the majority's conclusion in Division 4 that the trial court did not abuse its discretion in finding adequate pre-execution disclosure of Husband's financial status, I must respectfully dissent.

The antenuptial agreement in this case states that it is a "property agreement" and that it is the intent of the parties to clarify their respective rights to property owned at the time of, during, and after the marriage. The agreement includes a clause providing that the parties "have made a full disclosure unto each other of their assets and liabilities, and a full disclosure of their ownership of real and personal properties." Even assuming that this clause is sufficient to evidence full and fair disclosure of the facts enumerated therein, the agreement provides no information regarding the parties' income, and there is no inherent correlation between the value of one's property or assets and one's income. Thus, Wife's waiver of alimony, among other marital rights, was made without the disclosure of a factor critical to reaching such a decision. See *Corbett v. Corbett*, 280 Ga. 369 (1) (628 SE2d 585) (2006) (where antenuptial agreement purporting to disclose husband's separate property and assets failed to disclose his income and wife waived her right to alimony, nondisclosure was material).

The majority concedes that Wife never saw documentation of Husband's financial condition before entering into the agreement, and its recitation of facts regarding Wife's knowledge of Husband's business dealings and spending habits is insufficient to show that Husband met his burden under *Scherer* of establishing that Wife entered into the antenuptial agreement with knowledge of all material facts. That one is aware of certain assets does not foreclose

the possibility that other assets or income streams exist. See *Alexander v. Alexander*, 279 Ga. 116 (610 SE2d 48) (2005) (antenuptial agreement rendered unenforceable by failure to disclose existence of investment account). The majority cites *Mallen v. Mallen*, 280 Ga. 43 (622 SE2d 812) (2005) in support of its conclusion that there was full and fair disclosure of Husband's financial condition. But in *Mallen*, the wife was aware that the husband received significant income from his business and other sources because they had lived together for four years prior to the marriage and because financial disclosure forms attached to the antenuptial agreement set out their respective assets and liabilities, from which the nature of the husband's income could be ascertained. In contrast, the parties here had lived together for a significantly shorter period of time when their agreement was executed and no financial documentation of any kind was incorporated therein. Thus, *Mallen* is neither controlling nor persuasive authority under the facts of this case.

For these reasons, I respectfully dissent to Division 4 of the majority opinion and the affirmance of the trial court's ruling upholding the enforceability of the parties' antenuptial agreement.

I am authorized to state that Chief Judge Williams joins in this dissent.

WILLIAMS, Chief Judge, dissenting.

I fully concur with the dissenting opinion of Chief Justice Hunstein, and write separately to express my view that trial courts benefit most from appellate opinions which establish ascertainable standards and, if appropriate, impose an obligation to make specific findings on relevant issues. This is especially important when, as here, the abuse of discretion standard is applied on appeal.

As noted in *Sumpter v. Kosinski*, 419 NW2d 463, 471 (Mich. App. 1988), "[i]t should be observed that, when affairs of the heart are involved, legal guidance no matter how appropriate is often not heeded." I believe this Court should hold that in considering the validity of antenuptial agreements, trial courts should disregard boilerplate language to the effect that the parties have made a full disclosure of their respective financial conditions, and that a party's failure to retain an attorney or accountant to review a proffered agreement should be given no weight in determining whether an adequate disclosure was made. The majority opinion repeats the admonition of *Blige v. Blige*, 283 Ga. 65 (656 SE2d 822) (2008) that the best means of establishing that the mandated disclosure of financial condition was made is to attach a statement of assets and income to the agreement. *Blige*, 283 Ga. at 69, n. 12. I would go further, and hold that if such documentation is not incorporated into an antenuptial agreement, the trial court is obligated to make

findings on when the financial disclosure was made, the manner in which it was made (which could encompass a series of disclosures rather than a single, formal disclosure made in connection with the antenuptial agreement), and its accuracy in light of the evidence presented at the agreement enforcement hearing. Assumptions and presumptions based upon the parties' dealings with each other prior to the marriage are an insufficient basis for reaching a conclusion on that critical issue, because persons involved in intimate relationships may deliberately behave in a manner calculated to overstate or understate their financial circumstances.

For the foregoing reasons, I dissent to the affirmance of the trial court's judgment, which upheld the parties' antenuptial agreement without rendering objective findings on what financial disclosure was made and whether it comported with the parties' true financial condition at the time the agreement was made.

I am authorized to state that Chief Justice Hunstein joins in this dissent.

DECIDED NOVEMBER 9, 2009 —
RECONSIDERATION DENIED DECEMBER 15, 2009.

*Martin L. Fierman*, for appellant.
*Stone & Driggers, Kice H. Stone*, for appellee.